**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William A. FLOYD,
Defendant–Appellant.**

**No. 89–1019.**

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1989.

Decided Aug. 10, 1989.

Mitchell A. Mars, Asst. U.S. Atty., Dept. of Justice, Chicago Strike Force, Chicago, Ill., and Frank J. Marine, Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for the U.S., plaintiff-appellee.

Dan K. Webb, John M. O'Malley, and Bernard J. Bobber, Winston & Strawn, Chicago, Ill., for William Floyd, defendant-appellant.

Before WOOD, Jr., COFFEY, and FLAUM, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

William A. Floyd appeals from his convictions of embezzling union property in violation of 29 U.S.C. § 501(c) and of conspiring to embezzle union property in violation of 18 U.S.C. § 371. He also contests the district court's denial of his motion to dismiss the indictment due to prejudice on the basis of preindictment delay. We affirm.

## I. FACTUAL BACKGROUND

William A. Floyd ("Floyd") admits the following facts. In 1984, Floyd served as

both a business representative and trustee of Teamster Local 705 ("Local 705"). At the time, Louis Peick ("Peick") served as Secretary–Treasurer (the chief officer) of Local 705, a position he had held consecutively since 1957.

In August 1984, Peick informed Floyd that he (Peick) had a problem with a union car, the 1983 Cadillac Sedan DeVille which the union had assigned to Floyd. Peick told Floyd to "dump" the car. Floyd did not ask Peick why he wanted the car dumped nor did Floyd question Peick's authority to issue the order. Floyd contacted his cousin, Kenneth Floyd, and asked him to find someone to take the car.

Kenneth Floyd approached Otto Bremer and offered him the car. Unbeknownst to Kenneth Floyd, Otto Bremer was a government informant. Floyd subsequently gave his car keys to Kenneth Floyd so that a duplicate set could be made. On August 28, 1984, Floyd parked the car in the parking lot of a shopping center in Kankakee, Illinois where Bremer later arranged to "steal" it. Floyd then notified the Kankakee police department that the car had been stolen.

Several weeks later, Bremer met with Floyd to return the two-way radio which had been in the trunk of the car. Floyd informed Bremer that Peick had been "raising hell" with him for allowing the radio to be seized. Soon after, Floyd telephoned Peick and read off its serial numbers. After apparently checking these numbers against some records, Peick directed Floyd to get rid of the radio. Floyd threw the radio into the Kankakee River.

Floyd obtained the police report on the stolen car and gave it to Peick; Peick sent the report to the union's insurance carrier to receive reimbursement for the vehicle. The United States Fidelity & Guaranty Insurance Company subsequently issued a check for $12,850.00 to the union for the loss of the car. The insurance company also paid the union a small sum to partially defray the cost of a rental car.

In November 1985, two special investigators from the United States Department of Labor interviewed Floyd at his home about his role in the staged theft. In April 1985, a grand jury investigated union evidence relating to the taking of the car. The grand jury issued a subpoena to Peick in July 1986. On July 23, 1986, Peick's attorney, responding to the subpoena, stated that Peick had suffered a heart attack earlier that year and that he was unable to consult with counsel due to continued illness. Peick's counsel further stated that his client intended to invoke his fifth amendment privilege if he were called to testify. Peick died in November 1986.

Floyd was indicted on November 20, 1987. The indictment charged Floyd with conspiracy to commit mail fraud and to embezzle union property in violation of 18 U.S.C. § 371 (Count 1), embezzlement of union property in violation of 29 U.S.C. § 501(c) (Count 2), and mail fraud in violation of 18 U.S.C. § 1341 (Counts 3, 4, 5, 6, 7 and 8). The defendant moved to dismiss the charges against him on the ground that he was prejudiced by preindictment delay. Floyd pointed out that although the government had initiated its investigation in November 1985, he was not indicted for another two years. He argued that Peick's death in the interim precluded him from presenting a cogent defense.

The court rejected Floyd's motion to dismiss for several reasons. The court noted that the death of a material witness does not, in itself, establish prejudice. Indeed, it was not clear that Peick would have testified at trial even had he lived. The court pointed out that Peick, in his counsel's response to the grand jury subpoena, expressed an intent to invoke his fifth amendment privilege against self-incrimination. Accordingly, it was unlikely that Peick would have risked implicating himself by taking the stand at Floyd's trial. The court also remarked upon Floyd's failure to attempt to preserve Peick's testimony as a means of avoiding any prejudicial effect. Finally, the court stated that Floyd had not demonstrated how Peick's testimony could have exculpated him.

On October 3, 1988, Floyd pleaded guilty to the two counts of mail fraud (Counts 3 and 8), and to that portion of Count 1 which

dealt with conspiracy to commit mail fraud. In exchange for Floyd's guilty plea on those counts, the government moved to dismiss Counts 4 through 7. Floyd waived his right to a jury trial on the charges of conspiracy to embezzle (Count 1) and embezzlement of union property (Count 2).

During the bench trial, the government established its case-in-chief primarily through stipulated evidence. The prosecution introduced portions of the constitution and bylaws of Local 705 that described the expected duties of union officers. The by-laws specified that officers owed a fiduciary duty to the union and were expected to carry out union objectives through lawful methods.

The government also introduced evidence that in May 1984, Local 705 was involved in a prolonged labor dispute with a freight company, Overnite Transportation. During the strike, Overnite's employees were threatened and several of its vehicles were damaged. Union members frequently followed Overnite drivers in their cars, a practice known as "tailgating."[1] Overnite employees reported these occurrences and, when able, recorded the license plate numbers of cars involved in tailgating. The prosecution introduced a report which indicated that Floyd's car had been involved in a tailgating incident in June 1984.

Floyd testified at trial. He explained that Peick ordered him to dump the car. Floyd conceded that, at the time the order was issued, he suspected the car might have been involved in wrongdoing related to the Overnite dispute. However, Floyd stated that he never asked Peick why he wanted the car taken away. He also testified that Peick had not spelled out how he wanted this task accomplished.

Floyd admitted to arranging for the "theft" and destruction of the automobile. Floyd defended on the ground that he lacked the scienter to be held guilty of embezzling and conspiring to embezzle the car because Peick had granted him the authority to dispose of the property.

In support of his contention, Floyd submitted portions of the union's constitution and by-laws indicating that Local 705 was controlled by its principal executive officer, the Secretary–Treasurer. Floyd also presented testimony from John Navigato, a union board member and president of the union, and from Michael O'Grady, a former board member. Navigato and O'Grady testified that Peick ran Local 705 with "an iron fist." According to Navigato and O'Grady, Peick issued orders instead of asking for recommendations. Peick would often scream and yell at union personnel and, if a staff member disobeyed his orders, Peick would harshly reprimand, demote, or perhaps fire that worker. Peick called executive board meetings at his whim. At these meetings, other board members would generally agree to whatever Peick recommended. Peick often referred to the local as "his union."

Navigato, O'Grady, and the defendant testified that Peick exerted sole authority over the use and disposition of union cars. Moreover, the local's by-laws empowered the principal executive officer to "sell, exchange or lease automobiles or arrange financing therefor in behalf of the Local Union." Peick arranged for insurance on the cars and he alone determined who would receive the cars, and if and when the cars needed to be replaced.

The district court was not persuaded by Floyd's defense that he lacked the requisite criminal intent to embezzle union property or to conspire to embezzle. On November 4, 1988, the court found him guilty of both charges. Floyd was sentenced to two years imprisonment on Counts 1, 2, and 3, to run concurrently. The court suspended sentence on Count 8 and ordered Floyd to five years probation, conditioned on his performing 600 hours of community service and paying restitution to both the insurance company and to Local 705. Pursuant to 18 U.S.C. § 3013, Floyd was also ordered to pay a special assessment of $200.00. This appeal followed.

---

1. Evidently, the union members would closely follow the trucks in order to determine which companies had hired Overnite Transportation; the union would then picket these organizations.

## II. ANALYSIS

Floyd raises two contentions on appeal. He first argues that there was insufficient evidence to support his conviction under 29 U.S.C. § 501(c) and the conspiracy to embezzle conviction under 18 U.S.C. § 371 because the government failed to show that he had the requisite scienter. Second, he asserts that he was prejudiced by preindictment delay in that a key defense witness died prior to the date of trial. We examine each of these contentions in turn.

### A. Section 501(c) Violation

Floyd contends that the government failed to prove that he willfully violated a provision of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 501(c).[2] In assessing a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir.), *cert. denied*, ―― U.S. ――, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989).

This Court has not previously considered what standard applies to § 501(c) criminal cases. Several different tests have been formulated by other circuits. *See generally* Annotation, *Validity, Construction, and Application of § 501(c) of Labor– Management Reporting and Disclosure*

Act, 29 U.S.C.S. § 501(c), Prohibiting Embezzlement of Union Assets, 85 A.L.R. Fed. 803 (1987). For example, the District of Columbia Circuit, in *United States v. Boyle*, 482 F.2d 755 (D.C.Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973), held that the use of union funds for an illegal purpose is a *per se* violation of § 501(c).[3] Most other circuits have rejected the *per se* approach, however, favoring instead to apply varying analyses, dependent on the facts.

For example, where there is evidence of union authorization, some courts require the prosecution to show that the defendant specifically intended to deprive the union of its property and lacked a good faith belief that the appropriation would benefit the union. *United States v. Dixon*, 609 F.2d 827, 829 (5th Cir.1980); *see also United States v. Bane*, 583 F.2d 832, 835–36 (6th Cir.1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979); *United States v. Gibson*, 675 F.2d 825, 828 (6th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982).[4] On the other hand, if the union did not authorize the appropriation, the government need only prove lack of authorization and the defendant's fraudulent intent. *United States v. Lavergne*, 805 F.2d 517, 522 (5th Cir.1986); *Dixon*, 609 F.2d at 829; *United States v. Busacca*, 863 F.2d 433, 436 (6th Cir.1988), *cert. denied*, ―― U.S. ――, 109 S.Ct. 1640, 104 L.Ed.2d 156 (1989). *But see United States v. Durnin*, 632 F.2d 1297, 1300 n. 5 (5th Cir.1980) (authorization issue is irrele-

**2.** The statute reads as follows:

Embezzlement of assets; penalty

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c). Crimes that fall under § 501(c) are defined as "larceny-type" offenses in the criminal code. *United States v. Silverman*, 430 F.2d 106, 126 (2d Cir.1970) (Friendly, J.), *modified per curiam on other grounds*, 439 F.2d 1198, *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971).

**3.** After considering the legislative history of the Labor–Management Reporting Act, the *Boyle* court observed that while an *ultra vires* act will not automatically violate 501(c), there is no indication that Congress intended to exempt criminal acts from the reach of the statute. *Boyle*, 482 F.2d at 765. "No officer or union governing body could in all logic believe that a transfer for a criminal purpose was for a legitimate union purpose, was authorized by the union constitution or by-laws, or was for the union's benefit." *Id.*

**4.** The same test applies even when the authorization was inappropriately granted by a higher placed union official. *Bane*, 583 F.2d at 835–36.

vant if fraudulent intent has been thoroughly established).

The Second Circuit holds that a defendant should be acquitted if the evidence shows that he or she had a good faith belief that the appropriation was for union purposes and that the union had either authorized the act or would do so. *United States v. Santiago,* 528 F.2d 1130, 1133–34 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Ottley,* 509 F.2d 667, 671 (2d Cir.1975).

Proof of union benefit is less important in the First and Fourth Circuits. Those courts will find a § 501(c) violation if the defendant appropriated union property in the absence of either actual union authorization or a good faith belief that the action was authorized. *See United States v. Stockton,* 788 F.2d 210, 217 (4th Cir.), *cert. denied,* 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986); *United States v. Sullivan,* 498 F.2d 146, 152 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974); *but see Colella v. United States,* 360 F.2d 792, 804 (1st Cir.) (no violation if taking done for union purpose, even if act was unauthorized), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966).

A common thread running through all these tests is whether the defendant acted with fraudulent intent. *Durnin,* 632 F.2d at 1300 (fraudulent intent is the cornerstone of a § 501(c) violation). For this reason, the Eighth and Ninth Circuits focus on whether, at the time of the alleged appropriation, the wrongdoer acted with fraudulent intent. *See United States v. Welch,* 728 F.2d 1113, 1116–18 (8th Cir. 1984) (if union authorization were a complete defense, officials could potentially use it as a license to steal); *United States v. Thordarson,* 646 F.2d 1323, 1334–37 (9th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981). To determine fraudulent intent, the courts consider the totality of the circumstances. Under this analysis, authorization (or lack of) for the act is but one factor bearing on intent, as is proof that the union reaped no benefit from the act. *Welch,* 728 F.2d at 1119–20; *see also Thordarson,* 646 F.2d at 1336–37. It is this approach which the parties urge us to adopt.

▮ We had occasion to review the legislative history and policy behind the enactment of § 501 in *McNamara v. Johnston,* 522 F.2d 1157, 1163–65 (7th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), although the union officers in that case were defendants in a civil suit, not a criminal proceeding. We recognized that Congress incorporated principles from the common law of agency into § 501, and under agency law, "an agent cannot be insulated from criminal liability by the fact that his principal authorized his conduct." *Id.* at 1165.[5] We believe that the agency principle discussed in *McNamara* has application in § 501(c) criminal proceedings as well. A union officer cannot be absolved of wrongdoing by saying that the act was done with union authorization. However, authorization or lack thereof is pertinent to a determination of the defendant's intent, as is whether the defendant possessed a good faith belief that the union would benefit from the appropriation. *Cf. United States v. Duff,* 529 F.Supp. 148, 152 (N.D. Ill.1981) (a valid § 501(c) indictment will allege fraudulent intent, leaving the question of authorization as an evidentiary factor). For these reasons, we adopt the totality of the circumstances approach to ascertain fraudulent intent. We next address whether fraudulent intent has been demonstrated in this case.

▮ Floyd presents several reasons why his conviction should be overturned, all in support of his assertion that the prosecution failed to show that he acted with fraudulent intent. He first claims that he committed no embezzlement since he held a good faith belief that the appropriation of the car was authorized. He points to the fact that he took the car at Peick's direction as proof that he acted with the owner's assent.

---

**5.** The *McNamara* decision held, however, that the agent cannot be sued by the principal for carrying out the principal's request. 522 F.2d at 1165.

We reject this argument. As the court in *Stockton, supra,* noted, a higher ranking union official's express approval of an appropriation is of little import to § 501(c) cases because the true owner of union property is the collective membership, not individual union officers:

> The permission of the union is lacking if the appropriation or expenditure is outside the scope of the fiduciary trust placed in the defendant by the union as a whole and outside the scope of the powers of any superior union official on whose permission the defendant has sought to rely.

788 F.2d at 217.

Although he acknowledges that the union members were the true owners of the car, Floyd insists that the membership vested Peick with both apparent and actual authority over the disposition of union cars. Floyd claims that he believed, in good faith, that Peick had issued his directive with the tacit or explicit approval of the union. We are unpersuaded by this contention. While the union may have given Peick a certain degree of administrative control, Peick's authority did not extend to the destruction of union property. Indeed, the union's by-laws mandated that union business be carried out through lawful methods. For this reason, Floyd's contention that he held a good faith belief that the union had authorized Peick's order is without merit. *See also United States v. Decker,* 304 F.2d 702, 705 (6th Cir.1962) ("Loyalty to a superior does not provide a license for crime"); *United States v. Capanegro,* 576 F.2d 973, 980 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

Floyd contends that even if Peick's order was issued in contravention of his authority, it does not follow that Floyd acted with § 501(c) criminal intent. He argues that Peick ordered him merely to "dump" the car, not to stage a theft, a distinction he believes is an important one. Floyd claims that he is only guilty of exercising poor judgment in the method he used to execute Peick's order; this is why he admitted his guilt for the mail fraud charges. He therefore asserts that the method he used for disposing of the car is irrelevant to the § 501(c) issue. We disagree. It is well established that more than one category of offense can arise from the same factual context. *See Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (one transaction can support convictions under two separate statutes if each provision requires proof of a fact which the other does not).

Floyd stresses that he received no money from either Bremer or Kenneth Floyd. He claims that absence of a personal benefit to him evinces his lack of fraudulent intent. The government counters that Floyd did benefit from the disposal of the car. The prosecution notes that because his car had been tied to incidents at Overnite Delivery, Floyd had an interest in the car's destruction.

Regardless of whether Floyd personally stood to gain from the theft, the more important issue is whether he believed that the appropriation would somehow benefit the union. It is clear that Floyd could not have held such a belief, because the union gained nothing. Floyd maintains that the union benefitted because it received the insurance proceeds in recompense for the loss of the car, an argument we find unavailing. Indeed, "[e]mbezzlement is not excused by restitution of goods or services of equivalent value." *Stockton,* 788 F.2d at 219.

All of these factors, taken in the light most favorable to the government, support the district court's findings that Floyd conspired to embezzle and embezzled union property. We therefore affirm his convictions on these counts.

### B. Preindictment Delay

Floyd contests the district court's refusal to dismiss the indictment against him on the basis that he was prejudiced by unnecessary preindictment delay. He contends that his fifth amendment due process rights were denied. *See United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Floyd points out that the car was taken in 1984, yet no

indictment was issued until late 1987. By that time, Louis Peick had died. Floyd maintains that Peick would have testified as to how he ordered the disposal of the car. Since Peick was not available, the defendant argues, he was forced to take the stand in his own defense.

■ To prevail on his preindictment delay claim, Floyd must demonstrate that the delay caused him actual and substantial prejudice. *See United States v. Rein*, 848 F.2d 777, 781 (7th Cir.1988). He argues that he has done so and that the government must explain why the delay occurred. *United States v. Solomon*, 688 F.2d 1171, 1179 (7th Cir.1982).[6]

■ We conclude that the district court's denial of Floyd's motion to dismiss was proper. Floyd's portrayal of Peick's potential testimony as essential to his defense is speculative, and as such, will not suffice to establish actual prejudice. *See United States v. Fuesting*, 845 F.2d 664, 669 (7th Cir.1988); *see also United States v. Rogers*, 722 F.2d 557, 562 (9th Cir.1983) (appellants' contention that testimony might have corroborated testimony is insufficient to establish prejudice), *cert. denied*, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984). Moreover, as the district court noted, "the death of a witness alone is insufficient to establish actual prejudice." *United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir. 1987); *United States v. Williams*, 738 F.2d 172, 176 (7th Cir.1984). Thus, we see no error in the court's refusal to dismiss the indictment against the defendant.

### III. CONCLUSION

We uphold Floyd's convictions for conspiracy to commit embezzlement and embezzlement of union property. We also conclude that the defendant failed to show actual prejudice resulting from preindictment delay, and thus we affirm the district court's denial of the defendant's motion to dismiss the indictment.

AFFIRMED.

---

6. There is authority in this circuit holding that the defendant has the burden of showing that the government's delay stemmed from an impermissible purpose or ulterior motive. *See United States v. Watkins*, 709 F.2d 475, 479 (7th Cir.1983). Since, as discussed below, we hold that Floyd has not demonstrated substantial and actual prejudice, we need not determine which party bears the burden on this issue.