**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Salvatore CARLINO, also known as Sam Carlino, Defendant–Appellant.**

No. 96–1382.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1998.

Decided May 1, 1998.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Calvin Hulquist (argued), Hoopston, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Like the late Jimmy Hoffa, Salvatore "Sam" Carlino took advantage of the perks of being a union boss. Unlike the former Teamsters boss, however, Carlino has not ended up sleeping with the fishes, nor is he buried under the end zone of Giants' Stadium in the New Jersey Meadowlands. Carlino instead is tucked away in a federal prison serving a sentence for mail fraud (18 U.S.C. § 1341) and embezzlement (of the funds of a labor organization, 29 U.S.C. § 501(c)). Today we consider his appeal from the conviction that put him on ice.

Carlino, from Gary, Indiana, is a union boilermaker,[1] and back in 1987 he won election to the office of business manager of his local (# 374) of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers. The local union, which covers the entire state of Indiana, has more than 1,000 members. The business manager, also called the secretary-treasurer, is the head of the local. Carlino was reelected in 1990 and again in 1992.

Carlino's management style created problems, both for the union and, later, for himself. Because some of these problems are important to this appeal, we note a few examples.

One problem was Carlino's handling of the local's employees. As local 374's new business manager, Carlino was entitled to fire the local's at-will employees—when a new administration came in, patronage demanded some restaffing. However, to Carlino's dismay he discovered that the local's six secretaries were untouchable because they unionized on the eve of his election.

Apparently distressed at what he viewed as a ploy by the secretaries to cheat him out of his rights, Carlino hatched a scheme to get rid of their union. Over a period of three years he hired enough new secretaries to get a voting advantage in their union. In 1991, just into his second term, he told the last secretary he hired, Marilyn Alvey (the wife of Carlino's campaign manager), to file a petition to decertify the union. She did, and soon all the old administration's secretaries either quit or were fired.

Meanwhile, on a related matter, Carlino's girl friend, Diane Glowacki, got a cushy secretarial job with the union. She was paid $540 per week (plus hefty—$740 a week at times—overtime), although her job duties consisted of tasks that took previous secretaries 4 hours a week to perform.

The second, and larger, problem was Carlino's use of funds contributed by local contractors. Back in May of 1991 he negotiated a collective bargaining agreement with some of the local's biggest contractors and, as part of the deal, got them to agree to establish a Management Assistance Fund (MAF), an employee benefit trust fund to be comanaged by two trustees—Carlino and a designee of the contractors. The contractors pledged to fund the MAF with monthly contributions equal to 10 cents for each hour worked by a boilermaker. Carlino and the contractors agreed that the funds could only be spent for limited purposes like drug testing programs and hardship travel loans for the local's members. However, there was no trust

---

1. Boilermakers, as their name indicates, use their welding skills to make boilers, vats, and other metal containers, typically at refineries and power plants.

agreement in place, so Carlino agreed that it would be the local's job to draft the trust papers, and he promised that an acceptable version of the agreement would be in place by November of 1991. Although the trust agreement wasn't in place, the contractors agreed to start sending in their contributions immediately—but they told Carlino that he wasn't to touch the money until the MAF trust agreement was approved.

The contractors were as good as their word, and in the summer of 1991 their contributions started rolling in. Carlino, however, was not as good as his word. As soon as the money started arriving he established an account (on which he was the sole signatory), deposited the checks, and began to spend. In September he spent the contractors' money ($4,262.50) on two banquets at a place called Villa de Bruno. The banquets were for his supporters-union members who didn't actively support him weren't invited. By November 1991, when the trust agreement was supposed to be in place, he had written some 30 checks on the account, many for questionable purposes.

In November, with no trust agreement in sight, the contractors appointed one of their own, Charlie Howard, to look after their contributions (and fill the trustee slot when the trust started up). When Howard came into the picture, Carlino changed the MAF account to make Howard the sole signatory. He then simply gave checks to Howard to sign. Howard,[2] an elderly fellow who is now deceased, signed all the checks Carlino put in front of him-including ones for expenses far outside the MAF's limitations. One example was a September 30 picnic at "Santa Claus Land." The $11,985.95 invoice for the event touts the place where it was held in downstate Santa Claus, Indiana,—population 927—as the "Toy Capitol of the World". Carlino also sent out $40 Christmas checks to the members of local 374, covering their cost with a $30,000 check drawn on the MAF account.

Another problem concerned Carlino's use of the local's general fund (members' dues minus a per capita tax paid to the Interna-

tional union) to promote his 1992 reelection campaign. The general fund is the property of the local, but the business manager can use it provided he plays by the rules.

As for the rules (according to the International's constitution which governs the locals), the business manager can use the general fund to pay certain expenses—namely, recurring bills, like rent or phone bills, that cost less than $2,000—without getting approval from anyone. However, for other expenses, the business manager can't touch the general fund without approval of the local's members and the president of the International. Article 27.10 of the International constitution provides another exception by prohibiting use of the general fund to advance any member's candidacy for elected office. So, there were three classes of expenses: recurring expenses that were generally legal, out-of-the-ordinary expenses that were legal only with approval, and political expenses that were prohibited.

After the 1990 election the NLRB got wind of rumors that Carlino used the general fund to mail out his campaign literature. It called for a rerun election. In February of 1992 Carlino agreed to the rerun, which was scheduled for May. On March 2 he sent local members a notice of the election. At the same time he also scheduled banquets for back–to–back weekends in March. He originally planned on using the MAF to pay for them, but instead he decided to use money from the general fund. When Gene Walser, assistant to the president of the Boilermakers International, heard about Carlino's plan he gave him two pieces of advice: make sure the banquets were not political (by not talking politics and inviting all members, even nonsupporters); and get proper approval from the local and the president of the International. Carlino assured Walser he would follow the advice.

Carlino said he followed through on his promise to Walser. He testified that the local's membership approved the banquets—although he admits he never asked Charles Jones, the president of the International, to

---

2. Various witnesses described Howard, who was 75 years old, as "very timid," "meek," and "a little feeble." Why the contractors put him in his position is unclear.

approve them. He also said he invited all union members, not just his supporters, and that the banquets were informational forums, without a sniff of union politics. But strong evidence suggests that that was not the case. There was testimony that Carlino never offered the banquets up for a vote of approval, that he (and his whole slate of candidates) made political comments during the affairs—positive comments about his administration and negative ones about the opponents—and that nonsupporters weren't invited. In the end, the banquets cost the local's general fund $2,570.88 and Carlino won the 1992 rerun election (but only by 46 votes).

Regardless of how one might view these events, the International, swamped with complaints about Carlino, wasn't happy. In November of 1992, shortly after his reelection, it kicked Carlino out and imposed a trusteeship on the local.[3] The government also took an interest in Mr. Carlino. In January of 1995 he was indicted on 20 counts of mail fraud and embezzlement of the funds of a labor union—5 of the 20 counts were dropped on the eve of trial. A jury convicted Carlino on the remaining 15 counts, and the trial judge, Rudy Lozano, imposed a 33–month sentence. Carlino appeals, challenging the sufficiency of the evidence supporting his convictions on 10 of the 15 counts. He also complains about two sentencing determinations.

■ The 10 challenged counts involve Carlino's mail fraud convictions for using the MAF and his embezzlement convictions for using the local's money for the banquets. Normally, we review whether a jury verdict has evidentiary support in a criminal case by asking if there was sufficient evidence, when viewed in the light most favorable to the government, to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt. *United States v. Meadows*, 91 F.3d 851, 854 (7th Cir.1996). But Carlino did not preserve normal review of the issue because, after his motion for a judgment of acquittal at the close of the government's case was denied, he proceeded to put on his own evidence without renewing his motion. *Id.* So we review Carlino's claim only for plain error, which in this context is present only if his conviction amounts to a manifest miscarriage of justice.

■ To sustain Carlino's conviction under the mail fraud statute (18 U.S.C. § 1341) the evidence must establish that (1) there was a scheme to defraud, (2) the mails were used in furtherance of the scheme, and (3) Carlino participated in the scheme with the intent to defraud the contractors. *United States v. Hickok*, 77 F.3d 992, 1002–03 (7th Cir.), *cert. denied*, 517 U.S. 1200, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). The government presented a hybrid fiduciary/embezzlement/conversion theory of fraud-that "[i]t's a fraud ... [w]hen you promise somebody that you're going to use their money in a particular way, and you just use it for something different." Applying that theory to this case, the government's position was that Carlino "defrauded the contractors by promising them that the money was going to be used for A and using the money for B" instead. Carlino counters by arguing that the expenditures from the MAF were authorized or, failing that, at least not prohibited. Therefore, he says, there was no scheme to defraud.

Carlino first argues that because the permissible uses of the MAF were not clear, he didn't disobey them—and by not clearly disobeying them his conduct cannot be viewed as intentionally fraudulent. He is wrong. We think the fund's purposes, although not as clear as crystal, were clear enough. And Carlino's use of the MAF for political purposes—the parties and picnics, and the checks he issued that were clearly aimed at ingratiating him with his supporters—were far afield from the permissible uses of the MAF. Furthermore, Carlino didn't have authority to spend the funds in the first place—the contractors told him not to touch the money until the MAF was trusted, and it never was.

As an end run around this lack of authority, Carlino points at Howard's signature on some MAF checks and says that Howard, on behalf of the contractors, authorized his use

---

**3.** At trial, Mr. Jones explained that a trusteeship is temporary control of the local by the International. A trusteeship is appropriate when there is "financial malpractice" by the local.

of the money. This argument fails to account for the testimony of his secretary, Carol Bailey, who said Carlino bullied Howard into signing the checks. Bailey's testimony, if believed, could have easily led the jury to conclude that Howard was a pawn easily manipulated by Carlino. Also, Carlino wrote almost 30 unauthorized checks before Howard even came on board. The evidence was sufficient to support the mail fraud conviction, and that determination means that no manifest injustice has occurred.

■ The embezzlement counts charged Carlino with violating 29 U.S.C. § 501(c) with regard to using union funds to pay for the downstate banquets. The statute provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys . . . of a labor organization of which he is an officer . . . directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

The cornerstone of a § 501(c) violation is the presence of fraudulent intent, *United States v. Floyd*, 882 F.2d 235, 240 (7th Cir. 1989), so we focus solely on whether the evidence establishes that it was present.

The lack of authorization to expend the funds for the particular expenses is a circumstance indicative of fraudulent intent. Contrary to the Boilermakers' constitution, Carlino did not have the authorization of the president of the International for the expenditure of the union's funds to pay for the downstate banquets. To counter this failing, Carlino argues that he had the authorization of the president's agent, Mr. Walser. But there is nothing in the record to support the conclusion that Walser was (or held himself out to be) empowered to authorize expenditures on behalf of the International president. On the contrary, when Carlino mentioned his downstate meetings, Walser specifically pointed out the steps Carlino had to take to obtain authorization for the meetings, present his proposal to the membership at a regular meeting, obtain their approval, record it in the minutes, and get the president's approval. Carlino knew what he was supposed to do to obtain authorization; he simply refused to do it. As he had told Bailey, he was going to run the local; and nobody was going to tell him what to do.

It is also clear that Carlino did not fully inform Walser about the meetings. Carlino never told Walser that the proposed meetings involved an expensive dinner. In addition, contrary to Walser's statements, all of the members in the geographical area of the meetings were not invited. Carlino's treatment of the downstate meetings is the same as his handling of the banquets at Villa de Bruno-members of the union opposed to Carlino did not receive invitations. Finally, contrary to Walser's specific directions, the meetings were clearly political. Carlino and his slate of candidates attended the meeting while their competitors did not. Carlino told the members what a good job he and his candidates were doing for the union. Carlino discussed candidates running for office and said negative things about his opponents. Indeed, Ronald Angotti, Carlino's longtime friend and slated union president, testified that the downstate meetings were just like the dinners they hosted before the last election, but for which they personally paid rather than the union. Thus, even if Walser had authorized the expenditures, the authorization would have been a nullity because it would have been obtained without the disclosure of material information. See *United States v. Butler*, 954 F.2d 114, 119 (2d Cir. 1992). As we recognized in *Floyd*, 882 F.2d at 240, authorization does not preclude the finding of fraudulent intent and embezzlement. Moreover, as Carlino well knew, the use of union money to advance the candidacy of his slated officers violated both the union constitution and federal law.

Another factor establishing fraudulent intent is the lack of a good-faith belief that the expenditure would benefit the union. *Floyd*, 882 F.2d at 241. It is clear from the testimony of the government's witnesses that the meetings were not for the benefit of the union membership, but rather were for the benefit of Carlino. The real reason the meetings were held was to elect Carlino (and his slate of candidates) and thus perpetuate his hold on the union. In addition to the

 

self-serving political purpose of the meeting, it was not beneficial to the union as a whole since some members were excluded. While Carlino denied the exclusion of members and the political purpose of the meeting, the jury obviously determined that the government witnesses presented a different picture. For these reasons, we can only conclude that Carlino's conviction on the embezzlement counts was not a manifest miscarriage of justice.

■ Finally, Carlino raises two sentencing objections, neither of which has merit. First, he claims Judge Lozano erred when he enhanced the sentence for obstruction of justice. See § 3C1.1 of the federal sentencing guidelines. The judge specifically found four instances of false statements during the trial by Carlino which constituted obstruction of justice, and, having reviewed them, we see no basis for concluding that the findings, let alone all of them, were clearly erroneous. The judge independently evaluated Carlino's testimony and found that he was untruthful. Nothing more is required, and even if more was required, more was clearly present here. For instance, Carlino denied any direct involvement in the move to decertify the secretarial union. This testimony was clearly contrary to other direct testimony at trial and the strong circumstantial evidence that Carlino plotted to scuttle the union. Judge Lozano's independent finding that Carlino lied on the point was not clearly erroneous.

■ Lastly, Carlino claims that Judge Lozano clearly erred in calculating the total loss from Carlino's mail fraud and embezzlement under § 2F1.1(b)(1) and § 2B1.1. He says the court's findings as to loss are not sufficiently specific. We disagree. Judge Lozano calculated the loss by adding the sums expended from the general fund and the MAF and adding those to the inflated pay received by his girl friend, Glowacki, and the loss occasioned by the secretaries who lost their jobs as part of the decertification plot. The sum of these figures exceeds $120,000, and Judge Lozano's findings as to them are sufficiently specific to not be clearly erroneous.

For all these reasons, Mr. Carlino's conviction and sentence are .

AFFIRMED.