**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

ROSA MIRIAM DELLA PORTA, AKA
Rosa Miriam Galan-Lopez, AKA
Rosa Miriam Lopez,
          *Defendant-Appellant.*

No. 10-50168

D.C. No.
2:08-cr-00942-
PSG-1

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
May 4, 2011—Pasadena, California

Filed August 8, 2011

Before: Barry G. Silverman, Richard C. Tallman, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Silverman

10391

**COUNSEL**

Ethan Balogh (argued) and Jay Nelson of Coleman & Balogh LLP, San Francisco, California, for the appellants.

Andre Birotte Jr., Robert E. Dugdale, Dennis Mitchell (argued) and Elana Shavit Artson of the U.S. Attorney's Office for the Central District of California, Los Angeles, California, for the appellees.

**OPINION**

SILVERMAN, Circuit Judge:

In *United States v. Evanston*, we recently held that a district court abuses its discretion and impermissibly coerces a jury verdict where, "over defense objection and after the administration of an unsuccessful *Allen* charge, [the court] inquire[s] into the reasons for a trial jury's deadlock and then permit[s] supplemental argument focused on those issues, where the issues in dispute are factual rather than legal." ___ F.3d ___, No. 10-10159, 2011 WL 2619277, at *1 (9th Cir. July 5, 2011). In this case we also address the use of supplemental closing arguments to assist a deadlocked jury, but under significantly different circumstances: where the district court never gave an *Allen* charge and never inquired into the reasons for the jury deadlock. We hold today that under these circumstances, unlike those at issue in *Evanston*, the district court's decision to permit supplemental closing argument did not result in impermissible coercion and did not constitute an

abuse of discretion meriting reversal. Nor do we find any plain error in the district court's jury instructions.

## I. BACKGROUND

Between 1996 and 2006, Rosa Della Porta worked as a bookkeeper for the International Longshoremen's and Warehousemen's Union Local 26 in Los Angeles. As the union's bookkeeper, Della Porta was responsible for maintaining the union's receipt books and depositing various cash and check payments received by the union into its two bank accounts. In the spring of 2005, the union's internal auditor discovered that thousands of dollars in cash payments received by the union had not been deposited into its bank accounts. A Department of Labor investigation ensued, and Della Porta was charged with one count of embezzlement and theft of labor union assets under 29 U.S.C. § 501(c).

At trial, the government sought to prove that Della Porta used a dual deposit slip method to conceal her theft of the union's cash. Under this system, she prepared two sets of bank deposit slips when she made deposits into the union's accounts—one for the bank and one for the union's records. The union's deposit slips reflected that all of the cash payments had actually been deposited in the union's bank accounts, but the deposit slips submitted to the bank showed that either less or no cash had been deposited. In order to account for the difference in the cash value between the two sets of deposit slips, Della Porta substituted dues checks received from the union members' employers in place of the cash missing from the bank deposits. The dues checks did not appear on the union's deposit slips. There was a discrepancy of over $100,000 between the cash received by the union and the cash deposited into the union's bank account between 2003 and 2006. The government also presented evidence that, during the same approximate period, Della Porta deposited more than $15,000 in cash and more than $13,000 in money orders into her personal bank account. The government intro-

duced evidence of both the dual deposit scheme and the cash and money order deposits into Della Porta's account through Roberto Gonzalez, the lead investigating agent from the Department of Labor.

Della Porta testified in her defense. She admitted using the above-described dual deposit system but denied taking the union's cash for her personal use. She claimed that Luisa Gratz, the union's president, instructed her to withhold certain amounts of cash from the deposits into the union's bank accounts so the union could donate the cash to overseas labor-related charities and organizations. As for the influx of deposits into her personal checking account between 2003 and 2006, Della Porta claimed that her sister gave her some of the money to help her pay her household expenses, and that she also earned income on the side through part-time work with Mary Kay and Avon. When called as a witness by the government, however, Della Porta's sister denied ever giving Della Porta cash for any household or related expenses.

After deliberating for approximately three hours over two separate days, the jury sent the court a note that read as follows:

> Jury requests the numbers of the exhibits where the Government showed the dual deposit slips and then showed the relationship of deposits into Rosa's account. This was done during Roberto Gonzalez's testimony. He showed money orders, deposit slips, into Rosa's account. We need the numbers of the exhibits.

The court and the parties debated how to best respond to the jury's request. The court stated that it viewed the jury's request as "almost asking for a mini closing again" where the government would juxtapose the evidence of the cash taken from the union's bank deposits with the evidence of the cash and money orders deposited into Della Porta's bank account,

and Della Porta would argue that such a relationship could not be circumstantially inferred. The government offered to stipulate to such a process, but the court concluded that a "mini closing" wasn't necessary at that juncture. With both parties' approval, the court ultimately responded to the jury that it was "unable to respond to this specific request as worded." The jury deliberated for the remainder of the day.

The following morning, the jury sent out a second note asking if it could have copies of "the transcripts of Roberto Gonzalez's testimony." With the parties' approval, the court responded: "No. However, you may have the testimony of Roberto Gonzalez read to you in open court." After the court reporter read back Gonzalez's testimony, the jury returned to deliberations for about three hours. It then sent a third note to the court that stated: "The jury cannot come to a unanimous decision." The court proposed bringing the jurors out to conduct a direct inquiry of the foreperson, and potentially the other individual jurors, to determine whether it was "hopelessly deadlocked." Neither party objected to the proposal. The following exchange between the court and the foreperson ensued in the courtroom:

> THE COURT: . . . Please listen carefully and only answer the questions that I ask and don't volunteer or give me any additional information beyond what I ask.
>
> You have indicated that the jury is deadlocked; is that correct?
>
> THE FOREPERSON: Yes.
>
> THE COURT: Is there anything the Court could do to further assist in the deliberations?

THE FOREPERSON:   What do you mean like pro-
                  viding is [sic] with some
                  extras?

THE COURT:        I'm sorry?

THE FOREPERSON:   Do you mean by providing
                  us with some other informa-
                  tion?

THE COURT:        Let me give you some spe-
                  cific examples to follow up
                  on that question. For exam-
                  ple, would it be helpful to
                  read a portion—read testi-
                  mony back to you? Read tes-
                  timony back to the jurors?

THE FOREPERSON:   No, I don't think so.

THE COURT:        Would it be helpful, for
                  example, to allow the attor-
                  neys five or ten more min-
                  utes to argue each particular
                  side?

THE FOREPERSON:   I don't know if that would
                  help us.

THE COURT:        All right. Go back to the jury
                  room and—I don't know if
                  you want to discuss any par-
                  ticular issues as to whether
                  or not something else would
                  help you come to a decision.
                  Let me know your view that
                  you're   still   deadlocked.
                  Thank you.

After the court excused the jury, it asked the parties whether they would object if the jury came back and asked for "five minutes of argument on a point or just five more minutes of argument on either side." The government stated that it had no objection. The defense objected to any further argument, arguing that "it's in [the jurors'] hands at this point."

About ten minutes later, the jury sent the court a fourth note. The note stated: "We would like to hear the attorneys' argument again, just as you suggested." The government proposed asking the jurors if there was a particular issue they wanted to hear argument on. Della Porta's counsel objected that such an inquiry would invade the process of independent juror deliberations. The court sided with Della Porta on the issue and declined to make inquiry of the jury. It ruled that each side would be allowed fifteen minutes of additional argument, and that the government could reserve a portion of that time for rebuttal.

The government argued first, followed by the defense. The government then closed with a brief rebuttal. The jury resumed deliberations and reached a unanimous guilty verdict in less than an hour. Della Porta now appeals that verdict. She argues that the district court's employment of supplemental arguments impermissibly coerced a guilty verdict, and that the district court committed plain error by failing to instruct the jury regarding her defense that her actions were authorized by the union's president. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.   STANDARD OF REVIEW

We review the district court's decision to allow supplemental argument for abuse of discretion. *Evanston*, 2011 WL 2619277, at *2. Under this standard, " 'the district judge's discretion should be preserved unless its exercise could deprive the defendant of a constitutional right or otherwise prejudice defendant's case.' " *Id*. (quoting *United States v.*

*Goode*, 814 F.2d 1353, 1355 (9th Cir. 1987)). We review de novo, however, the question " '[w]hether a judge has improperly coerced a jury's verdict.' " *Id.* (quoting *United States v. Berger*, 473 F.3d 1080, 1089 (9th Cir. 2007)).

Because Della Porta never requested a jury instruction on an authorization defense at trial, we review the district court's failure to give such an instruction for plain error. *See United States v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006). To reverse under this standard, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). If these conditions are satisfied, we may exercise our discretion to reverse, but "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (internal quotation marks omitted).

## III.   DISCUSSION

### A.   *The District Court Neither Abused Its Discretion Nor Coerced a Guilty Verdict By Ordering Supplemental Closing Argument.*

In *Evanston*, we addressed, as a matter of first impression in this circuit, the use of supplemental closing arguments to assist a deadlocked jury in a criminal trial. The case involved charges of assault resulting in serious bodily injury occurring on an Indian reservation. 2011 WL 2619277, at *1. After a two-and-a-half day trial, and after deliberating for five hours over two separate days, the jury advised the district court that it could not reach a verdict. *Id.* The court then gave Ninth Circuit Model Jury Instruction 7.7—often referred to as an *Allen*, or "dynamite," charge[1]—and asked the jury to continue delib-

---

[1]"The term '*Allen*' or 'dynamite' charge is used to describe a supplemental instruction given by the court to encourage a jury to reach a verdict after that jury has been unable to agree after some period of deliberation. The original form of the instruction was approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 157, 41 L. Ed. 528 (1896)." *United States v. Nickell*, 883 F.2d 824, 828 (9th Cir. 1989).

erating. *Id*. After deliberating for almost another three hours, the jury again advised the court that it could not reach a verdict. *Id*. The court met with the parties and proposed "bring-[ing] in the members of the jury, ascertain[ing] the issue on which they are deadlocked, and allow[ing] ten more minutes to each side to argue that point." *Id*. The government welcomed the opportunity to reargue, but the defense objected to the proposed process. *Id*. The court then called the jury back into the courtroom. It admonished the jury that "[b]oth parties have a right to make sure that the judge and others do their very best to make sure that the jury empanelled [sic] to hear a case absolutely cannot decide it . . . before they declare a mistrial or release the jury." *Id*. at *9 (first alteration added). It then asked whether "the procedure of, without adding additional evidence, identifying particular points and rearguing those points might assist them in resolving the impasse." *Id*. at *2. The jury responded affirmatively and identified two issues on which it wished to hear further argument: witness credibility and how the victim's injuries were caused. *Id*. The court then excused the jury and allowed the parties to argue once more whether supplemental arguments should be permitted. The defense repeated its objections, but the court ultimately decided to allow reargument. *Id*. The government presented its argument first, followed by the defense. After two more hours of deliberation, the jury returned a unanimous guilty verdict. *Id*.

**[1]** We reversed and remanded for a new trial. Specifically limiting our holding to the circumstances at issue in the case, we held that the district court's employment of supplemental argument "resulted in impermissible coercion, and consequently an abuse of discretion meriting reversal." *Id*. at *10 n.15. We reasoned that the use of supplemental closing arguments under the circumstances infringed upon the traditional fact-finding role of the jury in two important ways: "(1) the judge's questioning as to the reasons for the deadlock required that the jury divulge the state of its unfinished deliberations, thereby violating the jury's deliberative secrecy,"

and "(2) the parties' supplemental arguments, coupled with the judge's insistence on continuing after a second deadlock, injected the court and the attorneys into the jury's deliberative process, thereby raising the specter of jury coercion." *Id.* at *5. Furthermore, given the court's decision to order supplemental arguments after an *Allen* charge and after the jury reported a second impasse, "the lawyers' arguments were of perhaps increased coercive value: the implication was, as with a second *Allen* charge, that the judge believed the jury had not accorded proper deference to his prior encouragement to reach a verdict." *Id.* (citing *United States v. Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977)). In sum, "[t]he compounded coercion resulting from the combined use of the deadlock instruction and supplemental arguments targeted to the jury's exact areas of dispute created a broad, impermissible opportunity for interference with the jury's role as sole fact-finder." *Id.* at *10.

[2] We also noted as influencing our decision the fact that the district court had available several less coercive alternatives to ordering supplemental argument, such as re-reading the original jury instructions relating to the jury's areas of concern, providing supplemental instructions regarding the relevant legal standard for causation, and allowing the jury to review portions of witness testimony. *Id.* at *7-8. In reversing the district court, however, we took pains to note that our decision was limited to the circumstances presented, *id.* at *10 n.15, and declined to "foreclose the possibility that supplemental argument treating factual matters could ever be used" in a permissible fashion, *id.* at *6. We also left open "the question of whether the use of supplemental arguments to address factual matters is necessarily or always an error of constitutional dimension, whatever the circumstances." *Id.* at *10 n.15.[2]

---

[2]We limited our holding in such a manner "because the Supreme Court's precedent on similar jury coercion issues has generally emanated

Using *Evanston* as our guidepost, we hold that the district court neither coerced a guilty verdict nor abused its discretion by ordering supplemental arguments under the facts presented in this case. We so hold because the set of key circumstances rendering the use of supplemental arguments coercive in *Evanston* are simply not present here.

**[3]** First, unlike in *Evanston*, the district court in this case never gave an *Allen* charge. Nor did it indicate to the jurors that it had to satisfy itself that they "absolutely" could not reach a verdict before declaring a mistrial. *Id.* at *9. These distinctions are crucial. As we alluded to in *Evanston*, *see id.* at *3, "[a] single *Allen* charge, without more, stands at the brink of impermissible coercion." *Seawell*, 550 F.2d at 1163. Although we have upheld the use of the *Allen* charge under certain circumstances, "[e]ven slight deviations from the language and procedure approved by this court can result in reversible error based upon likelihood of coercion." *Evanston*, 2011 WL 2619277, at *3 (citing *United States v. Mason*, 658 F.2d 1263, 1267-68 (9th Cir. 1981)). It is per se error, for example, to give a second *Allen* charge where the jury has not asked for one, because doing so "conveys a message that 'the jurors have acted contrary to the earlier instruction as that instruction was properly to be understood . . .' and that message serves no purpose other than impermissible coercion." *Id.* (quoting *Seawell*, 550 F.2d at 1163). It was against these background "core principles" that we viewed the district court's procedure in *Evanston*. *Id.* By ordering supplemental arguments after giving an *Allen* charge, "the implication was, as with a second *Allen* charge, that the judge believed the jury

---

from its supervisory powers over the federal courts, rather than any mandate from the federal Constitution." *Id.* at *10 n.15 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 239 n.2, 240 n.3 (1988)). This is so "because the presence of coercion produced by the trial court's actions depends on the circumstances of each case, rather than any inherent coercive feature of the procedure itself, and due process would not be violated where no actual or likely coercion occurs." *Id.*

had not accorded proper deference to his prior encouragement to reach a verdict." *Id.* at *5.

Moreover, the likelihood of coercion occasioned by the *Allen* charge in *Evanston* was exacerbated by the district court's later admonition to the jury after it reported it was deadlocked for a second time. Such commentary, coupled with the supplemental closing arguments, "risked the same type of coercion and prejudice contemplated by *Seawall*." *Id.* at *9 (citing 550 F.2d at 1163). It was very likely that, "having been admonished once with the *Allen* charge, and then admonished that the district court had to make sure the jury 'absolutely' could not reach a verdict before declaring a mistrial, the jurors in the minority might have been swayed to reach a verdict more readily, and against their honest beliefs, than if the supplemental arguments had not been given." *Id.*

**[4]** Here, none of the above concerns was implicated when the district court ordered supplemental closing arguments. Because an *Allen* charge was never given, there was no suggestion that "the judge believed the jury had not accorded proper deference to his prior encouragement to reach a verdict." *Id.* at *5. And because the court never made any additional statements to the jury encouraging it to reach a unanimous verdict, there was no risk that "the jurors in the minority might have been swayed to reach a verdict more readily," as was the case in *Evanston*. *Id.* at *9. The district court in no way pressured the jurors to surrender their conscientiously-held beliefs for the sake of securing a unanimous verdict, in stark contrast with the court's actions in *Evanston*.

A second key distinguishing feature of this case is that the district court never asked the jury to identify areas or issues of disagreement before ordering supplemental arguments. To the contrary, after the jury indicated it was deadlocked, the court scrupulously instructed the foreperson to only answer the questions asked and to not volunteer any additional infor-

mation, and none was. The court then merely asked the foreperson if anything would further assist the jury in its deliberations, such as reading back witness testimony or hearing further argument. After the jury elected to hear further argument, the court permitted the parties to readdress the jury without any specific guidance on the content of the argument. Siding with the defense on the issue, the court expressly rejected the government's suggestion to invite the jury to identify areas of factual disagreement.

All of these facts distance this case from *Evanston* and *United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004), the only other reported circuit decision discussing the practice of supplemental closing argument. In both *Evanston* and *Ayeni*, the district court asked the deadlocked jury to identify areas of disagreement, the jury identified specific factual matters on which it disagreed, and the parties were permitted to tailor their supplemental arguments to the jury's specific concerns. *See Evanston*, 2011 WL 2619277, at *2; *Ayeni*, 374 F.3d at 1314. This, in turn, "permit[ted] the lawyers to effectively participate in the jury's deliberations, almost as if they were in the jury room itself." *Evanston*, 2011 WL 2619277, at *5 (alteration in original) (quoting *Ayeni*, 374 F.3d at 1320 (Tatel, J., concurring)). Here, there was no such issue. The district court did not extract from the jury information about its fact-finding process. Instead, it carefully framed its questions to the foreperson as suggestions of possible forms of assistance, rather than any requirement that the jury reveal the nature of the issues impeding deliberations. Although the parties may have speculated about the issue hanging up the jury based on its earlier notes to the court, the same specter of coercion present in *Evanston* is simply not present here because the court never asked the jury to reveal the nature of its deadlock in the first instance.

Della Porta argues that the district court in this case, as in *Evanston*, "had in its arsenal of permissible actions numerous less coercive alternatives, including doing nothing at all." *See*

*Evanston*, 2011 WL 2619277, at *7. But that argument ignores the fact that the district court in *Evanston* took the coercive step of asking the jury to disclose the nature of its factual disagreement. Because it took that step, it had the option of re-reading the original jury instructions relating to each area of concern or fashioning an appropriate supplemental instruction with the parties' input. *Id.* at *7-8. Because the district court here never asked the jury to identify areas of disagreement, it was not clear what, if any, additional or repeated instructions might have been helpful in breaking the gridlock. The district court in *Evanston* also had the option of allowing the jurors to review witness testimony. *Id.* at *8. But here the court had already read back the testimony of the government's main witness, at the jury's beckoning. The jury had also rejected the court's suggestion of reading back further witness testimony to assist it in its deliberations. These considerations only further distance the circumstances of this case from those at issue in *Evanston*.

**[5]** We recognize that, as was the case in *Evanston*, the district court did not issue ameliorative instructions prior to the presentation of the supplemental arguments. *See id.* at *10. We also acknowledge that, as in *Evanston*, the jury reached a unanimous verdict relatively quickly after the close of supplemental arguments. *See id.* at *9. But these factors are by no means dispositive. *See United States v. Beattie*, 613 F.2d 762, 765 (9th Cir. 1980) (in evaluating claims of coercion following an *Allen* charge, "the time elapsed between a charge and verdict is significant, [but] it is not dispositive of the issue."). Furthermore, we considered them in *Evanston* only in the context of our discussion as to whether the defendant was prejudiced by the district court's error. *See* 2011 WL 2619277, at *9-10. Just as we did in *Evanston*, we rest our holding today on the totality of the circumstances of the case presented. Given the circumstances in this case—where the district court never delivered an *Allen* charge and never asked

the jury to identify areas of factual disagreement—we find no improper coercion or abuse of discretion warranting reversal.[3]

### B. *The District Court Did Not Commit Reversible Plain Error By Failing To Give An Authorization Instruction.*

We now turn to Della Porta's claim that the district court committed reversible plain error by failing to instruct the jury on her purported defense that her actions were authorized by Luisa Gratz, the union's president.

**[6]** A district court must instruct the jury on a theory of defense if the defendant "actually presents and relies" upon that theory at trial, even when she does not request such an instruction. *Bear*, 439 F.3d at 568. Although lack of authorization is not an essential element of § 501(c), it is nevertheless "likely to bear on the essential element of fraudulent intent." *United States v. Thordarson*, 646 F.2d 1323, 1336 (9th Cir. 1981). In a case where lack of authorization is "crucial in determining the defendant's intent," a jury instruction concerning the defense is "likely to be appropriate." *Id.*

**[7]** The district court did not plainly err by failing to instruct the jury on an authorization defense here. The crux of Della Porta's defense was not that Gratz or anyone else authorized her to take the union's funds. Rather, her defense was "that it was, in fact, Gratz who had embezzled the union funds, and that she did so by employing Ms. Della Porta as an unwitting dupe." *See* Appellant's Brief at 52. A valid authorization defense required more than just a showing that

---

[3]We also reject Della Porta's related contention that the district court's employment of supplemental closing arguments violated Federal Rule of Criminal Procedure 29.1. That rule merely sets forth the required order for closing arguments following a criminal trial. *See* Fed. R. Crim. P. 29.1 advisory committee's note (West 2011) (stating that the "rule is designed to control the order of closing argument."). It neither sanctions nor prohibits the use of supplemental closing arguments in all cases. *Cf. Evanston*, 2011 WL 2619277, at *6 n.11.

Gratz instructed Della Porta to set aside cash payments from the union's deposits. In the § 501(c) context, "the owner of the property is the union itself—its collective membership— not individual union officials who are not vested with power to dissipate union funds" unilaterally. *See United States v. Stockton*, 788 F.2d 210, 217 (4th Cir. 1986). "An appropriation or expenditure of union funds is therefore unauthorized if it is done without the permission of *the union*, even if it is approved by a superior union official." *Id.*[4] The evidence presented at trial did not support a conclusion that the collective union membership ever instructed or authorized Della Porta to withhold cash from the union's deposits for the purpose of donating money to overseas charities. Gratz and other union officials all testified unequivocally at trial that the union never discussed or authorized donations to overseas charities. Indeed, even Della Porta testified that no one on the board (other than Gratz) ever said anything to her about donations to overseas charities, and that Gratz tried to conceal the union's alleged donations to overseas charities from the other trustees. Because the evidence presented did not support a finding that the union ever authorized Della Porta's actions, the district court did not plainly err by failing to instruct the jury on an authorization defense.[5]

---

[4]*See also United States v. Floyd*, 882 F.2d 235, 241 (7th Cir. 1989) ("a higher ranking union official's express approval of an appropriation is of little import to § 501(c) cases because the true owner of union property is the collective membership, not individual union officers" (citing *Stockton*, 788 F.2d at 217)); *cf. United States v. Mett*, 178 F.3d 1058, 1068 (9th Cir. 1999) ("[T]hose who embezzle from ERISA pension funds cannot argue that their otherwise illegal transactions were 'authorized' by the plan participants because the participants themselves lack the legal power to 'authorize' such a diversion of pension monies.").

[5]We also reject Della Porta's related argument that the district court committed reversible plain error by instructing the jury on fraudulent intent. In *United States v. Ford*, we held that the "[c]riminal intent necessary for theft offenses such as those enumerated in [18 U.S.C. § ] 664 exists when a defendant knowingly acts wrongfully to deprive another of property." 632 F.2d 1354, 1361 (9th Cir. 1980), *overruled on other*

## IV.  CONCLUSION

The district court neither coerced a guilty verdict nor abused its discretion by ordering supplemental closing arguments under the circumstances presented in this case. The district court also did not commit reversible plain error by failing to instruct the jury on an authorization defense, as the evidence presented and relied on by Della Porta at trial did not support a finding that her actions were authorized by the union.

**AFFIRMED.**

---

*grounds by United States v. DeBright*, 730 F.2d 1255 (1984). Section 664 contains language identical to § 501(c)'s language on specific intent. *See* 18 U.S.C. § 664. Because § 501(c), like § 664, is a theft offense, and because the operative language of § 501(c) is identical to that of § 664, the district court did not plainly err by instructing the jury that fraudulent intent "means knowingly acting wrongfully to deprive another of property."