**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rattan Lal AGGARWAL,
Defendant–Appellant.**

No. 93–4436.

United States Court of Appeals,
Fifth Circuit.

March 17, 1994.

Rehearing Denied April 13, 1994.

---

738

E.X. Martin, III, Dallas, TX and Mark M. Baker, Slotnick & Baker, New York City, for appellant.

H.S. Garcia, Asst. U.S. Atty. and Bob Wortham, U.S. Atty., Sherman, TX, for appellee.

Before JONES and DeMOSS, Circuit Judges, and COBB,[1] District Judge.

DeMOSS, Circuit Judge:

A jury convicted defendant/appellant Rattan Lal Aggarwal of one count of conspiracy and four counts of wire fraud in connection with his participation in a fraudulent loan scheme. Aggarwal appeals on several grounds. Finding no basis for reversal, we AFFIRM Aggarwal's conviction and sentence.

Aggarwal raises seven points of error, claiming that: (1) there was insufficient evidence to convict him; (2) the trial court erred in denying Aggarwal's motion to depose an unavailable witness; (3) the trial court erred in refusing to dismiss the indictment due to late disclosure of *Brady* material; (4) the government's expert witnesses violated Fed-

1. District Judge of the Eastern District of Texas, sitting by designation.

eral Rule of Evidence 704 by giving legal definitions and implied opinions on the defendant's state of mind; (5) the trial court erred by refusing to dismiss the indictment for vindictive prosecution; (6) the trial court erred by refusing to give Aggarwal's proposed jury instructions on knowledge, willfulness and intent; and (7) the trial court erred during sentencing by refusing to consider Aggarwal's request for downward departure.

## I. DISCUSSION

### A: Sufficiency of the Evidence

Aggarwal claims there was insufficient evidence to support his conviction because the government did not prove that he had the required specific intent to commit a fraud.

Aggarwal was convicted of wire fraud under 18 U.S.C. § 1343 [2] and of conspiracy under 18 U.S.C. § 371.[3] The government thus had the burden of proving (1) a scheme to defraud that involved use of the wires; and (2) that Aggarwal had the specific intent to commit fraud in furtherance of the scheme. *United States v. Rochester*, 898 F.2d 971, 976 (5th Cir.1990); *United States v. Fagan*, 821 F.2d 1002, 1008 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

In assessing a challenge to the sufficiency of the evidence, we must consider the evidence in the light most favorable to the verdict and must afford the government the benefit of all reasonable inferences and credibility choices. *United States v. Stouffer*, 986 F.2d 916, 921–22 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993). The evidence is sufficient if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt based upon the evidence presented at trial. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Kim*, 884 F.2d 189, 192 (5th Cir.1989). The intent necessary to support a

conviction can be demonstrated by direct or circumstantial evidence that allows an inference of an unlawful intent, and not every hypothesis of innocence need be excluded. *United States v. McAfee*, 8 F.3d 1010, 1014 (5th Cir.1993); *United States v. Aubrey*, 878 F.2d 825, 827 (5th Cir.), *cert. denied*, 493 U.S. 922, 110 S.Ct. 289, 107 L.Ed.2d 269 (1989); *United States v. Henry*, 849 F.2d 1534, 1536 (5th Cir.1988).

According to the indictment, Aggarwal was involved in a scheme in which the conspirators collected "advance fees" of $10,-000 to $120,000 from potential borrowers by fraudulently promising to arrange pre-approved multi-million-dollar loans from foreign lending institutions. The conspirators were Aggarwal, who was self-employed as a broker of financial loan packages under the name of RACORP, Inc.; Edwin E. Whitis, II and Deanna J. Whitis, who were officers and directors of Commerce National Exchange Corporation ("CNEC"); and John Brumfield, a CNEC employee. Edwin Whitis pleaded guilty to a lesser charge and testified at trial for the government. Whitis admitted to having sought to defraud the potential borrowers, and testified that Aggarwal was part of the scheme. Other government witnesses, including Deanna Whitis and other former CNEC employees, testified that Aggarwal was the "big boss" who gave Edwin Whitis instructions, and that Whitis could not have come up with such a scheme on his own. CNEC placed advertisements in the *Wall Street Journal* claiming it could pre-approve 100 percent funding of loans with lending commitments direct from banks via fax or letter. Aggarwal provided a reference letter for CNEC, allowing it to meet the strict requirements of the *Wall Street Journal* advertisement acceptance policy. Victims were told falsely that the conspirators had been successful in obtaining funding for numerous clients. In reality, no potential borrower ever received a loan. Victims who asked for a reference were directed to call a pre-ar-

---

**2.** This provision punishes one who "transmits [money or messages] by means of wire" to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. 1343.

**3.** This provision provides penalties when "two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371.

ranged number, where they talked to a "former client" who was in reality Deanna Whitis using a false name.

Aggarwal was in charge of arranging the loan commitments from European banks through the ExportFinazierungsBank ("Export Bank") in Vienna, Austria.[4] Aggarwal also gave Edwin Whitis instructions on drafting the contracts to be signed by the victims. The contracts obligated the borrower to acquire an irrevocable letter of credit or prime bank guarantee to serve as collateral. The conspirators did not help the victims obtain the guarantees; they wanted the victims to default in this obligation, because then the victims would lose the advance fee. The government, in its arguments to the jury, characterized the scheme as a "chicken-and-egg" situation. Edwin Whitis testified that Aggarwal told him that the guarantee companies "couldn't deliver the collateral in the first place." According to trial testimony, funding was highly unlikely because the required collateral/guarantee was virtually impossible to obtain for the required terms. Several government witnesses testified that if a borrower had the credit to obtain that kind of collateral, he or she would have no reason to purchase one of CNEC's "loan commitments." The government's expert witness on international banking, Robert Rendell, put it this way:

> "[T]his security provision was something impossible for [the victim] to meet, because she could not obtain the letter of credit without the funds, and she could not get the funds without the letter of credit, so she was sort of stuck in limbo. And therefore, this [loan] commitment was of no use to her because she could never draw down the funds."

Whitis said he and Aggarwal had an agreement to split the advance fees, which amounted to more than $3 million. Aggarwal admitted having received at least $1.5 million in transfers from CNEC. Whitis and Aggarwal spoke daily and Aggarwal gave instructions on how to handle disgruntled victims. The business plans taken from the victims by CNEC were placed in a file cabi-

net and never sent to Aggarwal, and thus never sent to any source of funding. Whitis testified that the only purpose for taking the business plans was to lend the scheme an air of legitimacy. The government's expert Rendell stated that no legitimate institution would lend or commit the millions of dollars contemplated in this scheme without a detailed business plan setting out how the money would be used. Another government expert, John Shockey, called the scheme "a typical advance fee scam."

Aggarwal testified in his own defense and claimed that he was unaware of the scheme to defraud committed by Whitis, and that he earned whatever fees he received because he was ready and willing to provide the loan commitment if the borrower would obtain the required collateral.

The government argued that Aggarwal's intent to defraud the potential borrowers can be inferred from the evidence, including the facts that Aggarwal received $1.5 million in transfers from CNEC, that he was in contact with Whitis daily, and that, of the dozens of "clients," not one ever received the promised loan.

Considering the evidence in light most favorable to the verdict, we hold that a rational jury could have found the required elements of wire fraud and conspiracy, including the most contested element, namely Aggarwal's intent to join the conspiracy and defraud the potential borrowers. Therefore, we hold that the evidence is sufficient to support Aggarwal's conviction.

### B: Denial of Rule 15(a) Motion to Take Deposition

■ Aggarwal claims the trial court erred by denying his motion under Federal Rule of Criminal Procedure 15(a) to depose an unavailable witness. The rule allows such depositions when "due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial." Fed.R.Crim.P. 15. The district court decides when "exceptional circum-

---

4. At some point the Export Bank's license was revoked, but as we explain in Parts B and C, the license issue was not crucial to the government's case.

stances" exist, subject to appellate review for abuse of discretion. *United States v. Allie,* 978 F.2d 1401, 1405 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 281 (1993).

In this case, the trial court denied Aggarwal's motion to depose Charles Zani, a consultant of the Export Bank, regarding the status of the Export Bank's license.[5] The court refused to allow the deposition on the basis that Aggarwal's motion was untimely, that the testimony would be hearsay, and that the issue was "not essential to the defense of this case." Aggarwal argues that exceptional circumstances existed because Zani, a citizen of France, would not voluntarily enter the United States because he feared arrest. He also contends that the Export Bank's ability or inability to do business was "crucial to the government's case."

The district court did not abuse its discretion in finding that there were no exceptional circumstances. The government's central theory of the case at trial did not rest on the Export Bank's inability to do business. Rather, the government's main argument was the "chicken-and-egg" analogy—that the victims were put into a no-win situation where they could not obtain the required collateral and were forced to default. In addition, Aggarwal's expert was allowed to explain that the Export Bank was not the lending bank, but merely an agent bank, a function it could serve regardless of the formal status of its license in Austria.

■ Alternatively, we affirm the trial court's denial of Aggarwal's motion on the basis of unexcused delay. Even though the 15(a) motion was filed about a month before the case finally went to trial on its third setting, it was untimely in that it was about a month *after* the court's deadline for pretrial motions. Aggarwal contended that it took until November 19, 1992, to "identify and locate" Zani, but the evidence shows that Aggarwal knew of Zani and how to contact him as early as 1986.

■ Denial of a Rule 15(a) motion for untimeliness is not an abuse of discretion. *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977); *United States v. Whiting,* 308 F.2d 537, 541 (2d Cir.1962), *cert. denied,* 372 U.S. 919, 83 S.Ct. 734, 9 L.Ed.2d 718 (1963); *United States v. Broker,* 246 F.2d 328, 329 (2d Cir.1957), *cert. denied,* 355 U.S. 837, 78 S.Ct. 63, 2 L.Ed.2d 49 (1957); *See also* 2 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 242 & nn. 4–5 (1982 & Supp. 1993) ("The rule is silent on when a motion for a deposition is to be made. It should be made promptly, and a motion for a deposition that will delay the trial may be rejected as untimely.").[6] In addition, we will not disturb the trial court's determination that this was not an exceptional circumstance.

### C: Late Disclosure of Brady Material

■ Aggarwal claims that the trial court erred by refusing to impose sanctions on the government for violation of his rights under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1968). *Brady* and its progeny hold that the government violates due process when it suppresses material evidence favorable to the defense. Evidence is "material" only if there is a reasonable probability that the verdict would have been different had the evidence been disclosed to the defendant, or if, in light of the nondisclosure, the reviewing court's confidence in the guilty verdict is undermined. *Jones v. Butler,* 864 F.2d 348, 354 (5th Cir. 1988), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

---

**5.** The trial court also denied Aggarwal's later request to depose "Dr. Gruber," an Austrian administrative judge identified in a German-language letter dealing with the Export Bank's license. This letter is discussed in connection with Aggarwal's *Brady* claim.

**6.** Aggarwal cites *United States v. Farfan–Carreon,* 935 F.2d 678, 680 (5th Cir.1991), claiming that it supports his position that his motion was not untimely. But *Farfan–Carreon* can be distinguished. In that case, even though the motion was filed on the morning of trial, neither side objected on the basis of timeliness, and timeliness was not at issue on appeal. Instead, the trial court's denial of the Rule 15(a) motion was reversed when the appellate court found "exceptional circumstances."

█ About two weeks before Aggarwal's trial, the government obtained several documents, written in German, which stated that the Export Bank retained some ability to do business even after its license was revoked. According to an informal translation obtained by defense lawyers, a letter from a "Dr. Gruber," an Austrian judge, explained that in Austria, an administrative appeal of the bank's license revocation restores the status quo, as if the license had never been revoked. The government did not give these documents to the defense until the morning trial began.

Aggarwal contends that the Export Bank's license status was a material issue, and that therefore the late disclosure of these documents was a *Brady* violation obligating the trial court to dismiss the indictment, order a mistrial, or alternatively allow continuance to depose "Dr. Gruber" under Rule 15(a). He is mistaken. Even though the indictment alleged that the loan commitments were worthless because the Export Bank's license had been revoked, the government avoided the license issue at trial and instead focused on its "chicken-and-egg" argument. The fact of the revocation came up several times during testimony, but, as stated above, Aggarwal's expert was given a chance to explain that the bank could still serve as an agent bank. In the trial, the Export Bank's license was a peripheral issue not material to the defense. We hold that no *Brady* violation occurred.

### D: Opinions on Ultimate Issues

█ Aggarwal claims that the government's expert witnesses, by using terms like "scam," "fraudulent," and "fraud," violated Federal Rule of Evidence 704(b).[7] Aggarwal says the government's experts used the words too often in characterizing the loans in this case, thus implying that Aggarwal had the required intent to commit fraud. The government, however, points out that (1) its

witnesses used these words mostly to describe the area of their expertise (Shockey worked for the "fraud unit" of the Office of the Comptroller of the Currency); (2) the defense expert used the "offending words" even more than the government experts; and (3) the government experts never commented directly on Aggarwal's state of mind; and (4) Rule 704(a) allows expert testimony that "embraces an ultimate issue to be decided by the trier of fact," so an expert opinion that the loan scheme was "fraudulent" is not improper. In addition, because the defense did not object to these words during trial, we will reverse only for plain error, *United States v. Vaquero*, 997 F.2d 78, 83 (5th Cir.), *cert. denied sub. nom., Taylor v. United States*, —— U.S. ——, 114 S.Ct. 614, 126 L.Ed.2d 578 (1993), and no such error is apparent here.

### E: Vindictive Prosecution

█ The conviction now on appeal was based on the second indictment of Aggarwal in this case. Aggarwal was initially indicted on November 16, 1988 for wire fraud, conspiracy and other crimes in connection with the same loan scheme that was made the basis of this appeal. He agreed to cooperate with the government and entered into an agreement to waive indictment and plead guilty to a one-count information alleging misprision of felony, with the indictment being dismissed at sentencing. Aggarwal was sentenced to 12 months and appealed his sentence to the Fifth Circuit. The Fifth Circuit, 909 F.2d 1480 (5th Cir. July 18, 1990, TABLE), vacated the guilty plea and sentence because Aggarwal had not been adequately informed that he was subject to a term of supervised release, and because the base offense level was incorrectly calculated. On remand, Aggarwal refused to again waive indictment and plead to the information. The government re-indicted Aggarwal on May 21, 1992.

---

7. Rule 704 states: "(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are for the trier of fact alone."

Aggarwal argues that the 1992 indictment carried "far more severe penalties," than the one-count information alleging misprision of felony, and therefore improperly penalized him for exercising his right to appeal. However, this argument misses the point. The 1992 indictment should be compared with the 1988 indictment, not with the misprision charge in the information to which Aggarwal agreed to plead guilty. The government points out correctly that when Aggarwal after his appeal refused to waive indictment and plea to the information, "the deal was off and the parties were back to square one." Under the original indictment in 1988, Aggarwal was subject to possible statutory punishment of 250 years of imprisonment. In contrast, the re-indictment in 1992 subjected him to a possible 45 years of imprisonment. The misprision charge in the information carried a maximum penalty of 3 years. The proper comparison is between the two indictments, and there was no vindictiveness, because Aggarwal's exposure to punishment decreased, rather than increased, in the second indictment. *Byrd v. McKaskle,* 733 F.2d 1133, 1136 (5th Cir.1984) (stating that "threshold question" in examining a claim of vindictiveness is whether the defendant was subjected to a more severe charge).

Even if Aggarwal had been subjected to a harsher penalty after his appeal, the inquiry would not end there. *United States v. Guthrie,* 789 F.2d 356, 361 (5th Cir.1986) ("That more severe charges have been employed is not dispositive, for the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of vindictiveness."). The appellate court "must examine the prosecutor's actions in the context of the entire proceedings," and if there is any indication that the prosecutor had a legitimate reason (other than vindictiveness) for increasing the charges, then no presumption of vindictiveness is created. *United States v. Krezdorn,* 718 F.2d 1360, 1365 (5th Cir.1983) (en banc), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984). The prosecutor's decision to reindict Aggarwal on considerably lesser charges than those brought in the original indictment was motivated by the desire to see that

justice was done, not to punish appellant for taking an appeal. The district court, in its order denying Aggarwal's motion for release pending appeal, stated this view:

> "The fact that plaintiff decided to appeal his initial sentence after his plea of guilty to an information charging misprision of felony, and now faces possible incarceration on a longer duration, is evidence of a calculated gamble on the part of the defendant, and not malicious prosecution by the government. Plaintiff's malicious prosecution claim is without merit and does not raise a substantial question of law or fact."

The trial court's argument is convincing. The Supreme Court has held that changes in the charging decision are often an integral part of plea negotiations and are an inaccurate measure of improper prosecutorial "vindictiveness." *United States v. Goodwin,* 457 U.S. 368, 380, 102 S.Ct. 2485, 2492, 73 L.Ed.2d 74 (1982). There was no "vindictiveness" in this case.

### F: Refusal of Proposed Jury Instructions

Aggarwal claims the trial court erred in refusing to give his proposed jury instructions, which read as follows:

> "Members of the Jury: In evaluating whether the defendant acted 'knowingly,' 'willfully,' or 'intentionally' with regard to the fraudulent scheme alleged in the indictment and to which Edwin Whitis has testified, you may consider whether defendant needed to have knowledge of any of Mr. Whitis' actions or statements to have met his responsibilities of securing commitments from different banks in Europe. Thus, if you find that all that defendant needed to do in order to earn his fee was simply secure a commitment from a European bank, and that such fee was thereupon rightfully earned regardless of any false representations that Whitis would have made to the borrowers, then you may consider such finding in furtherance of determining whether defendant lacked any motive to have knowingly aided Whitis to commit the alleged fraud.

> Similarly, if you find that despite the revocation of its license, the Export Finance Bank was fully authorized to act as a

fiduciary and thereby secure loan commitments for American borrowers from other European banks, which loan commitments had the effect of authorizing defendant to collect a fee, then you may consider that factor as well in determining whether defendant needed to have any knowledge of Mr. Whitis' admitted false representations to borrowers and hence whether, here again, defendant lacked any motive to have been a part of Mr. Whitis' fraudulent scheme."

A district court's refusal of a defendant's proposed jury instructions is reviewed for abuse of discretion; the trial judge has substantial latitude in formulating the jury charge. *United States v. Sellers,* 926 F.2d 410, 413 (5th Cir.1991); *United States v. Rochester,* 898 F.2d 971, 978 (5th Cir.1990). We may reverse only if the requested instruction (1) is substantially correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point such that failure to give it seriously impaired the defendant's ability to effectively present a given defense. *Rochester,* 898 F.2d at 978; *United States v. Mollier,* 853 F.2d 1169, 1174 (5th Cir.1988).

■ Here, the court instructed the jury basically that to find defendant guilty of aiding and abetting a fraud, the jury must find that he had the intent to defraud. Aggarwal argues that the given charge did not adequately present his defense to the jury, because the jury did not fully understand that he did not need to know about Whitis' actual criminal activities in order to legitimately benefit from them in good faith. We disagree. The government points out, and Aggarwal concedes, that the given jury charge was taken substantially from the Fifth Circuit Pattern Jury Instructions and gave correct legal definitions of "knowingly" and "willfully." Aggarwal, through his own testimony and arguments of counsel, was able to adequately present his defense. We hold that there was no abuse of discretion in refusing the requested instructions.

*G: Refusal to Consider Downward Departure*

■ At sentencing Aggarwal asked the trial court to depart downwards to bring his sentence more in line with the sentence he received for pleading guilty to misprision of felony. The trial court said nothing, and did not depart downwards. Aggarwal argues on appeal that perhaps the court mistakenly believed that it did not have the power to depart. The record does not support this contention. At the beginning of the sentencing hearing the court commented that it realized counsel was making legal arguments to support a downward departure. The court went on to hear these arguments, plus those of the government for an upward departure, before imposing a term of imprisonment within the guideline range. We will not review a district court's refusal to depart from the Sentencing Guidelines unless the refusal was in violation of the law. *United States v. McKnight,* 953 F.2d 898, 906 (5th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 2975, 119 L.Ed.2d 594 (1992).

## II. CONCLUSION

For the reasons we have stated, we find no basis for reversal; therefore we AFFIRM Aggarwal's conviction and sentence.