In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-4373

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REGINALD OWENS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 586—**Harry D. Leinenweber**, *Judge.*

ARGUED JUNE 6, 2002—DECIDED AUGUST 19, 2002

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted real estate appraiser Reginald Owens of mail fraud and wire fraud for his part in a multi-million dollar real estate and mortgage fraud scheme. Owens appeals, contending that the district court improperly admitted evidence and that there was insufficient evidence to support his conviction. We affirm.

## I. History

### A. The Scheme

From 1995 until 1998, several individuals engaged in a multi-million dollar real estate and mortgage fraud scheme

involving approximately eighty properties in the Chicago area. The scheme was a land "flip" scheme, which basically involved having people purchase distressed properties for cash and then immediately resell that same property at artificially-inflated prices. One of the ringleaders of this flip scheme was Brian Parr, who was personally involved in approximately sixty flip transactions. Parr's role in the scheme was to first identify the property he wanted to buy through realtors and by searching the Multiple Listing Services ("MLS"), a real estate computer database that showed properties for sale and the seller's listing price. Parr would then try to negotiate the lowest possible price for the property and would offer to buy the property in cash. At the same time that he was contracting for the purchase of the property, Parr would prepare to sell the property at an artificially-inflated price to a second buyer.[1] In order to accomplish this, Parr needed the second buyer to obtain approval for a home mortgage, and Parr needed to obtain an inflated appraisal that could be used to justify the higher sales price to the lending institution.

Parr's co-schemers worked to locate potential second buyers. As an incentive to second buyers, Parr instructed the co-schemers to offer to sell the properties for no money down and cash back at closing. Once the co-schemers identified a second buyer, the buyer had to qualify for and obtain a mortgage. The second buyers, however, typically did not have jobs or bank accounts and thus could not have normally qualified for a mortgage. To overcome this obstacle, several other co-schemers, including loan officer Tamira Smyth, created false documents to submit to the

---

[1] Both sales usually happened simultaneously at the office of Parr's attorney, although sometimes the second sale actually was executed *before* Parr had purchased the property at issue.

lender institutions. These false documents included W-2 tax forms, check stubs, employment verifications, and other documents.

In addition to the false documents, mortgage brokers also worked with an appraiser to ensure that the appraisal matched the contract price for the second sale in order for Parr to maximize his profits. The appraisers were able to inflate the value of these properties by omitting from their appraisal reports critical information from the MLS and by comparing the sale house involved in the flip transaction to houses that were far superior. The two primary appraisers in the scheme were Owens and Melva Wynn.[2] With the appraisers' help, Parr's profit ranged from approximately $10,000 to $180,000 per flip transaction. Parr then used the profits from each transaction to pay his co-schemers.

Parr's profits, however, came at the expense of lending institutions and the federal government because the second buyers could not or would not pay the mortgage payments due on the properties. Further, once these properties went into foreclosure, private lending institutions lost millions of dollars because the mortgages were based on inflated values for the properties and those inflated values had already been pocketed by Parr and the co-schemers. Moreover, because many of the loans on the properties were insured by the Federal Housing Authority ("FHA"), a substantial portion of the losses ultimately were incurred by the United States Department of Housing and Urban Development ("HUD").

---

[2] Melva Wynn pleaded guilty in this case.

*B.  The Trial*

Owens was indicted on two counts of mail fraud and on one count of wire fraud for his part in the scheme. *See* 18 U.S.C. §§ 1341 & 1343. At trial, Parr testified on behalf of the government and explained the scheme described above. Parr testified that he first met Owens while completing a real estate transaction in February 1997. Subsequently, Parr began to use Owens as his appraiser on his flip transactions, and Owens appraised ten flip transactions for him. Parr explained that without an appraisal equal to the extremely inflated value of the second sale, the scheme would not have been successful. Parr testified that Owens always appraised the property at the value that Parr required and that he paid Owens a $500 bonus for these inflated appraisals in addition to Owens' standard appraisal rate.

Smyth also testified for the government and explained that she participated in eighteen to twenty flip transactions and that she asked Owens to perform appraisals on ten to twelve transactions. Smyth stated that she would call Owens and give him the address of the subject property as well as the value that she wanted for that property. Owens would usually respond that the desired value was too high and that he did not think he could appraise the property at that high of a value. Smyth would then offer Owens money to obtain the desired value, and he would eventually appraise the property at the desired figure. In order to support the inflated price, Smyth explained that Owens would take pictures of properties at certain angles in order to hide defects not reported in his appraisal and that sometimes Owens did not even visit the properties when he performed his appraisals.

Smyth further testified that for each appraisal, Owens was paid between $250 and $400 for his standard fees, which would appear on the closing contract, plus he

was also paid a "kickback" of anywhere from $500 to $1,000. The kickback, of course, did not appear in the closing contract. Smyth also testified about recorded telephone calls she made to Owens, and transcripts of those calls were admitted at trial. During those calls, Owens and Smyth discussed $3,000 in kickbacks that were in arrears.

Several Federal Bureau of Investigation agents and HUD agents testified about interviews they conducted with Owens on three separate occasions. According to Agent Kelly Popovotis of HUD, Owens made the following statements: Owens initially stated that he had performed five appraisals for Parr before changing that answer to eight to ten appraisals and then finally to eleven. Owens also initially claimed in the first interview that he did not know the sale price of the properties (i.e., the price that Parr wanted on the appraisal) before doing the appraisals. Owens, however, admitted in his second interview that he had received the sale price before doing the appraisals. Further, Owens initially explained that he had received $250 to $500 for each appraisal, but later changed that answer to $1,000 and claimed that the additional money was for a quick turnaround. Additionally, FBI Agent Ron Carver testified that during a third interview with Owens, Owens admitted that he believed that Parr was participating in land-flip transactions.

Finally, the government offered into evidence Owens' appraisal reports, and expert witness John Miaso analyzed these reports and testified about his findings. A summary of the appraisal reports showed the dollar value difference between the listing price on the property and Owens' inflated appraised value (i.e., the price at which Parr resold the property), as well as the percentage difference between the two. This evidence showed that Owens had over-appraised by at least $32,100 to as much as $153,000 per property, and the percentage increase ranged from a low of 32% to a high of 340%. For example, the listing price

of the property at 4351 South Calumet was $49,000, and it was sold to a co-schemer for $45,000. Owens, however, signed off on an appraisal of $198,000, for a difference of $153,000 (a 340% increase). Miaso testified that although different appraisers may come up with different values for the same property, the variations would typically range from between five to ten percent.

Miaso also testified that all appraisals must meet the requirements of the Uniform Standards of Professional Appraisal Practice ("USPAP") and that all appraisers must certify that each appraisal they performed was conducted in conformity with USPAP. The USPAP requires certifying that the appraiser personally inspected the subject property and the comparable properties, that the appraiser was truthful in his comments on the subject property and the subject community, and that the comparable properties that were used were actually "comparable" and that any price adjustments were made accordingly to reflect differences between the subject property and the compared property. The appraiser's USPAP certifications also provided that:

> I have not knowingly withheld any significant information from the appraisal report, and I believe to the best of my knowledge that all statements and information in the appraisal report are true and correct.

> I have no present or contemplated future interest in the subject property, and neither my current nor future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

> I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of the specific result, or the occurrence of a subsequent event in order to receive my

compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

Owens signed such appraisal certifications for all of the appraisals he performed for Parr's properties. Finally, Miaso testified that Owens' reports used improper comparable properties and failed to provide crucial information.

In his defense, Owens attempted to convince the jury that he lacked the requisite intent to defraud.[3] To this effect, he noted that he had only participated in approximately ten of the eighty flip transactions and that he had made, at most, $1,000 per flip transaction, whereas Parr and the others had made tens of thousands of dollars. Additionally, Owens argued that the kickbacks were for expedited, not fraudulent, appraisals.

The jury subsequently convicted Owens of two counts of mail fraud and of one count of wire fraud, and the district court sentenced him to thirty-three months of imprisonment on each count to run concurrently.

## II. Analysis

Initially, Owens contends that the district court erred in admitting certain parts of Miaso's testimony, which

---

[3] A conviction under the mail fraud statute requires that (1) there was a scheme to defraud; (2) the mails were used to further that scheme; and (3) the defendant participated in that scheme with an intent to defraud. *See United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). Similarly, a conviction under the wire fraud statute requires that (1) there was a scheme to defraud; (2) wires were used in furtherance of the scheme; and (3) the defendant participated in the scheme with the intent to defraud. *See United States v. O'Brien*, 119 F.3d 523, 532 (7th Cir. 1997)

according to Owens, "violated Rule 704(b) of the Federal Rules of Evidence [because] the expert testif[ied] to the ultimate issue of whether the appraisals done by defendant were fraudulent in nature."

Federal Rule of Evidence 704 provides:

(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

In other words, Rule 704 allows testimony regarding an ultimate issue *except* when that ultimate issue concerns the defendant's mental state or condition and that issue constitutes an element or defense of the crime charged. On appeal, Owens contends that Miaso's testimony violated Rule 704(b), and the government first responds by asserting that defense counsel failed to preserve the error for review by objecting to the testimony at trial on Rule 704(b) grounds.

Immediately prior to expert witness Miaso taking the witness stand, Owens objected to any testimony by Miaso that Owens' appraisal reports were fraudulent:

Defense Counsel: I forgot to make this objection earlier. . . . His reports say that the appraisals done by Mr. Owens were fraudulent. I do not think that as an expert he ought to be allowed to testify that he thinks they're fraudulent. He ought to be able to testify to all the inadequacies, all the ways they violate the uni-

> form standards. . . . But to say that they are fraudulent to the jury as an expert invades the province of the jury to decide whether his intent was to defraud, because that is what he is charged with, mail fraud and wire fraud.
>
> Government Counsel: That's what he's going to testify to. His opinion that these [appraisals] were fraudulent and misleading, and he's going to say why.
>
> The Court: He can do it. It's the old ultimate issue deal.
>
> Defense Counsel: Right

Thus, at trial, Owens' objection was based "on the old ultimate issue" objection, which Rule 704 abolished, *see*, *e.g.*, *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980), and focused on the *reports*' fraudulent nature, not on Owens' mental state.

However, on appeal, Owens refocuses his argument on the mental state prohibition now embodied in Section (b) of Rule 704 and contends that Miaso improperly testified regarding Owens' intent to defraud. Although we question whether defense counsel's objection was specific enough to inform the trial judge that Owens was objecting to the evidence on Rule 704(b) grounds, we will nevertheless address Owens' contention on the merits.

At trial, Miaso testified that the relevant appraisal reports were defective in that they did not follow certain standards set forth by public and private regulatory bodies, and Owens has no qualms with this testimony. However, at the end of each description of a certain appraisal report, Miaso added that in his opinion, the appraisal report was "misleading and fraudulent." Owens contends that the final comments—that the appraisal reports were "misleading and fraudulent"—violated Rule 704(b). However, as we noted above, Rule 704(b) addresses the defendant's mental state, and Miaso did not comment in any way about Owens' mental state.

In *United States v. Aggarwal*, 17 F.3d 737, 743 (5th Cir. 1994), the defendant was convicted of wire fraud and appealed, contending that the government's expert witness violated Rule 704(b) by using terms such as "scam," "fraudulent," and "fraud" to describe the loans at issue. According to the defendant, those terms implied that the defendant had the required intent to commit fraud. *See id.* In response, the government noted, *inter alia*, that the expert "never commented directly on [the defendant's] state of mind," thus Rule 704(b) was not violated, and the Fifth Circuit affirmed. *Id.* In the present case, as in *Aggarwal*, Miaso only used the phrase "misleading and fraudulent" to describe the quality of the appraisal reports, and thus never commented directly on Owen's state of mind. Therefore, this testimony was properly admitted. *See Aggarwal*, 17 F.3d at 743; 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE & PROCEDURE § 6285, at 395 (1997) ("Rule 704(b) usually bars only a direct statement that defendant did or did not have the required mental state.").[4]

Owens next contends that the evidence was insufficient to support a finding that he intended to defraud. Normally, we review whether a jury verdict has evidentia-

---

[4] At oral argument, there was discussion as to whether or not Rule 704(b) should even apply to Miaso's testimony as the legislative history of the rule suggests that Congress only intended to limit "the scope of expert testimony by psychiatrists and other mental health experts." S. Rep. No. 225, 98th Cong., 2d Sess. 230 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412. However, we can find no federal circuit court that specifically has so held, *see United States v. Richard*, 969 F.2d 849, 855 n.6 (10th Cir. 1992) (collecting cases), and in the present case, we need not address the issue. *See also* WRIGHT § 6285, at 392 (noting that the Seventh Circuit, among others, has suggested that Rule 704(b) is limited to psychiatrists and other mental health experts but that many courts have assumed that it applies more broadly).

ry support in a criminal case by asking if there was sufficient evidence, when viewed in the light most favorable to the government, to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt. *See United States v. Carlino*, 143 F.3d 340, 343 (7th Cir. 1998). However, Owens did not preserve normal review of the issue because, although he moved for a judgment of acquittal at the close of the government's case, he failed to renew his motion at the close of all the evidence. Therefore, we review Owens' claim only for plain error, which in this context is present only if his convictions amount to a manifest miscarriage of justice. *See id.* "Manifest miscarriage of justice is perhaps the most demanding standard of appellate review. We will reverse only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000).

To sustain a conviction under the mail fraud statute, *see* 18 U.S.C. § 1341, the evidence must establish that (1) there was a scheme to defraud; (2) the mails were used to further that scheme; and (3) Owens participated in that scheme with an intent to defraud lenders. *See United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). Similarly, Owens' conviction under the wire fraud statute, *see* 18 U.S.C. § 1343, can be upheld only if the evidence establishes that (1) there was scheme to defraud; (2) wires were used in furtherance of the scheme; and (3) Owens participated in the scheme with the intent to defraud. *See United States v. O'Brien*, 119 F.3d 523, 532 (7th Cir. 1997). Owens concedes, as he must, that there was a scheme to defraud and that the mails and wires were used in furtherance of that scheme. His sole contention on appeal is that he had no knowledge of the scheme and therefore did not act with an intent to defraud.

Intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another. *See United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). As direct evidence of a defendant's fraudulent intent is typically unavailable, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.*

A review of the record makes clear that Owens has not met the heavy burden he bears in making a manifest miscarriage of justice argument on appeal. The jury's conclusion that Owens knew of the scheme and had the requisite intent to defraud is supported by Agent Carver's testimony that Owens admitted that he believed that Parr was participating in a flip scheme. The jury's conclusion that Owens had an intent to defraud is also supported by the abundant evidence that Owens received "kickbacks" for his artificially-inflated appraisals, which were not reported in the closing contracts. *Cf. United States v. Britton*, 289 F.3d 976, 982 (7th Cir. 2002) (finding an intent to defraud when misrepresentations were contemporaneous with benefits received by defendant). Further, the jury's conclusion is supported by Miaso's testimony that Owens' appraisal values were extraordinarily high and that although appraisers may differ by five to ten percent, an over-appraisal of 340% was misleading and fraudulent. Combined with the fact that Owens repeatedly left critical information off of the appraisals, there is more than enough evidence in the record to support a finding of an intent to defraud.

On appeal, Owens alleges that the fact that he made less money than Parr and Smyth supports his claim that he did not know of the scheme and did not have an in-

tent to defraud. Additionally, he claims that the fact that he was only involved in approximately ten of the eighty flip transactions supports the same conclusion. Neither of these arguments has any merit because the fact that some schemers made more money than others is completely irrelevant to Owens' intent to defraud. *See, e.g., United States v. Moore*, 991 F.2d 409, 414 (7th Cir. 1993) ("The fact that [the defendant] made less profits than his co-conspirators does not diminish the importance of his role in the offense."). Additionally, the fact that Owens was only involved in approximately ten of the flips is explained simply by the fact that he did not become part of the scheme until it had been in operation for approximately two years and the fact that it came to an end shortly after he became a co-schemer.

### III.  Conclusion

For the foregoing reasons, Owens' convictions and sentence are AFFIRMED.

A true Copy:

       Teste:

                     _____

                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*