# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4222

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

GARY T. WHITLOW,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03-30096-DRH—**David R. Herndon**, *Judge*.

_____

ARGUED MAY 24, 2004—DECIDED AUGUST 25, 2004

_____


Before RIPPLE, MANION and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. A jury convicted Gary T. Whitlow of ten counts of possessing automatic weapons in violation of 18 U.S.C. § 922(o). Mr. Whitlow challenges the district court's admission of certain evidence and also challenges the sufficiency of the evidence with respect to his conviction on counts seven through ten. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

On August 4, 2000, Mr. Whitlow's wife, Rachel Whitlow, rented a storage unit at The Storage Center in O'Fallon, Illinois. The rental paperwork listed both Mrs. and Mr. Whitlow as the renters of a ten-foot by ten-foot unit designated as unit J-11. The Whitlows rented unit J-11 from August 4, 2000, until July 31, 2001.

Michael Walker owned and operated The Storage Center. In May of 2001, another renter reported a theft of items in his unit. Thereafter, Walker increased security and began conducting regular checks of the units to ensure that un-rented units were empty and that rented units were locked.

### 1. Weapons recovered on May 18, 2001

During his patrols on May 17, 2001, Walker observed two men in a pick-up truck loading items from unit J-11. Walker did not suspect anything at the time and waved as he rode past on his golf cart. While patrolling the following day, however, Walker noticed that the lock on the J-11 unit was missing. Walker's wife then called Mrs. Whitlow to report the missing lock.

A short while later, Walker noticed a U-Haul truck enter the storage facility; Walker thought one of the men in the truck looked familiar. When Walker noticed that the U-Haul stopped in front of unit J-11, he suspected a burglary was in progress. He immediately called the police and locked the perimeter gate to the storage facilities.

Officer David Matevey arrived first and arrested Steven Hopkins and Rodney Taylor as they attempted to leave the

storage facility premises in a U-Haul truck. Officer Kerry Andrews also responded to the scene. Upon arrival, he found a bolt cutter, gloves and a two-way radio in the cab of the U-Haul. The cargo compartment of the U-Haul contained the following items: 1) an MP40 submachinegun, 2) four Sten type submachineguns manufactured from imported, homemade and surplus parts, 3) an MP40 receiver tube,[1] 4) one tripod with a pintle assembly attached and one without a pintle assembly attached, both designed to fit an M1919 machinegun,[2] 5) a box containing various gun parts, 6) a box of magazines for 9mm rounds, 7) a military style rucksack with .223 caliber ammunition, 8) stencils for the letters W-H-I-T-L-O, 9) a military jacket with the name "Whitlow," and other items. After surveying the contents of the U-Haul, the officers went to unit J-11; when they arrived, they found that the lock was missing and that the remaining contents were in disarray.

While the officers were still at The Storage Center, Mrs. Whitlow arrived. She confirmed that the items in the back of the U-Haul belonged to her husband. The police took custody of the items and called the Bureau of Alcohol, Tobacco and Firearms ("ATF") for assistance.

Hopkins' testimony at trial provided some context to the events leading to his arrest at The Storage Center on May 18, 2001. He stated that he was smoking crack cocaine at Joe Wingate's[3] house on May 17, 2001. Someone suggested

---

[1] These items were the bases for the first six counts of the indictment against Mr. Whitlow.

[2] A pintle assembly holds the machinegun on the tripod.

[3] Hopkins initially failed to identify Wingate as his accomplice because Hopkins knew that Wingate had killed people, and he
(continued...)

breaking into a storage shed so that they could get more money to buy crack. Hopkins had a driver's license and was asked to drive the truck. Hopkins stated that he and Wingate drove the white pick-up to the storage facility on May 17, 2001, and picked a unit at random.[4] Once they opened the unit, they loaded duffel bags and other items in the truck until it was full. While doing this, Hopkins recalled waving to someone riding by on a golf cart as they worked. Hopkins and Wingate eventually closed the door, leaving numerous items behind.[5]

The next day, May 18, 2001, Wingate asked Hopkins to steal the remaining items and provided him with an empty U-Haul truck. This time Hopkins went with Rodney Taylor instead of Wingate. Hopkins loaded wooden boxes that Wingate had instructed him to steal. Once Hopkins and Taylor completed loading the truck, they attempted to leave but found the gate locked and saw the police arriving.

ATF Agent Daniel Owens met with local police on May 18, 2001. He conducted a preliminary test and determined that the firearms recovered from the U-Haul were fully automatic machineguns. At the end of May, Agent Owens brought Agent David Klein, who was familiar with World War II machineguns, to inspect the items recovered from the

---

[3] (...continued)
feared that Wingate would retaliate. Indeed, Wingate previously had been convicted of murder.

[4] Hopkins stated the lock may have been missing or open on unit J-II.

[5] Walker's surveillance tape for May 17, 2001, confirmed much of Hopkins' testimony. The tape revealed that a white truck entered the property empty and left full. Later that day, it returned empty and again left full.

U-Haul. Agent Klein discovered that one of the boxes contained M16 parts; based on this discovery, he reasoned that, prior to the burglary on May 17, 2001, the storage unit may have contained AR-15s that had been converted into M16 machineguns. Agent Klein also believed that other machineguns possibly were missing and had hit the streets because the U-Haul contained two tripods that were designed to be used with Browning M1919 machineguns.

### 2. Weapons recovered after May 18, 2001

The weapons that formed the bases of counts seven through ten of the indictment were recovered through more circuitous means. In October 2001, Joe Wingate was indicted for an unrelated bank robbery that had taken place on June 23, 2001. When authorities went to Wingate's house to make the arrest, officers recovered an Eagle Arms M15, which eventually was traced to Mr. Whitlow. Specifically, documents entered into evidence confirmed that Mr. Whitlow had purchased the gun in semi-automatic form on June 7, 1999.[6] Again, like the other weapons, this gun had been altered to operate in a fully automatic mode.

In a later interview with the FBI, Wingate admitted he had additional stolen guns and agreed to turn them over for the assurance that he would not be prosecuted for the possession of those weapons. According to Wingate's testimony at

---

[6] Once Mr. Whitlow was identified as the gun's owner, Deputy Tom Woods of the United States Marshal's Service telephoned Mr. Whitlow to inform him that the gun had been recovered. The officer asked if the gun belonged to Mr. Whitlow, and Mr. Whitlow responded that he was not sure because he could not recall the serial number on the gun. When he was told the gun was traced to him, Mr. Whitlow stated that the gun was his.

Mr. Whitlow's trial, Wingate came to possess the guns in the following way: Two men brought the guns to Wingate's house a month or a month and a half before his bank robbery on June 23, 2001.[7] He thought two of the guns looked like M16s or military rifles and two were "real big ones . . . [l]ike big machine guns, . . . you know, military guns that they put on trucks, mount them on trucks." Trial Tr. III at 92-93. He identified the Bushmaster receiver, an Eagle Arms M15, two M1919s and an MP40 as guns brought to him in the white pick-up. Wingate explained that he did not use any of the stolen guns during his bank robbery because they were too big. He stated that he had not altered the guns in his possession, that he never had altered guns and that he did not know how to manufacture or alter weapons.

Wingate also testified regarding what happened to the guns after they came into his possession. He stated that the guns were at his house for a few days and then moved to the home of Alan Bledsoe. Bledsoe then hid the guns over his bathroom ceiling. The guns were moved again after a week or two when the police came to Bledsoe's house to question him about the bank robbery. All of the guns except one were taken to a property owned by "Stiff."[8] The guns remained at Stiff's house until December 2001. At that time, Wingate, through his attorney, made arrangements for his wife, Felicia Wingate, to turn the guns over to authorities.

---

[7] With respect to these details, Wingate's testimony differed from that of Hopkins. As noted above, Hopkins testified that Wingate participated in the first burglary and ordered the second. Wingate denied directing anyone to steal for him.

[8] Wingate asserted that there originally was a sixth gun, another MP40, which he believed was stolen by Bledsoe prior to the transfer of weapons to Stiff's property.

Upon instructions from Wingate, Felicia Wingate went to pick up the guns from Stiff. The guns reportedly were stored outside and covered with sheeting. ATF Agents Martin Feely and John Jiminez met with Felicia Wingate on a street in Washington Park, Illinois, to receive the guns. Felicia Wingate stated that she never before had seen guns like the ones delivered to the ATF agents. She turned over two M1919 machineguns (one with a pintle assembly attached), a Model MP40 machinegun and the upper receiver to an AR-15. The M1919 guns matched the tripods recovered on the U-Haul truck, one with and one without a pintle. One M1919 was stamped with the initials "G.T.W."

With respect to the upper receiver of the AR-15, Wingate explained that he had given a gun that looked like an M16 to Eric Drisdell, a relative by marriage. Drisdell later returned part of the gun to Wingate, claiming that police had seized the lower receiver of the weapon. While Drisdell still had the gun in his possession, he took it to a shooting range to see if he could purchase a magazine for it. The owner of the shooting range called authorities when it was discovered that the weapon had an auto sear, which made it capable of firing in a fully automatic mode.[9] ATF Agent Lauren Townsend then confiscated the lower receiver of the Bushmaster AR-15.

After seizing the portion of the AR-15 from Drisdell, Agent Townsend examined gun records to ascertain the original purchaser. She found that Mr. Whitlow had purchased the gun from the same shooting range; the documents indicated that the gun was a semiautomatic at the time Mr. Whitlow purchased it. This lower receiver fit the upper receiver that was later turned over by Felicia Wingate.

---

[9]  Drisdell denied knowing the gun was altered.

## B. District Court Proceedings

A grand jury indicted Mr. Whitlow on eleven counts of possessing machineguns on or about May 17, 2001, in violation of 18 U.S.C. § 922(o).[10] The weapons recovered from the U-Haul on May 18, 2001, formed the bases for the first six counts of the indictment. The basis of count seven was possession of the Bushmaster AR-15 receiver seized from Drisdell when he attempted to purchase ammunition for it. Count eight charged Mr. Whitlow with possession of the Eagle Arms M15A2 recovered when authorities searched Wingate's home in October 2001. The bases of counts nine and ten were the two M1919 machineguns turned over by Felicia Wingate. Finally, count eleven charged Mr. Whitlow with possession of the MP40, also turned over by Felicia Wingate.

At trial, in addition to the testimony of the witnesses set forth above, the Government also offered the testimony of

---

[10] 18 U.S.C. § 922(o) provides: "(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun." Additionally,

> [t]he term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 923(a)(23) (incorporating § 5845(b) definition by reference).

David Stopher.[11] Stopher was an associate of Mr. Whitlow from 1995 to 1998. Stopher and Mr. Whitlow shared a common interest in guns and would frequently attend gun shows together where they bought firearms and firearm parts. Additionally, he and Mr. Whitlow had possessed machinegun parts and had manufactured machineguns during those years. Specifically, during 1996 and 1997, they had assembled four A-15 machineguns together by inserting auto sears in them.

Stopher also was prepared to testify that, after the theft of Mr. Whitlow's storage unit, Stopher coincidentally was in Fairview Heights, Illinois, in May of 2001 to show a gun to local ATF agents; he had purchased a Browning 1919 that was firing in automatic mode when it should only have been a semi-automatic weapon. The agents, along with Stopher, went to compare the 1919 with two others in the evidence vault. When Stopher saw the monogram "G.T.W." on one of the 1919 machineguns, he remarked that it looked like something Mr. Whitlow would do.

Mr. Whitlow objected to Stopher's testimony on the ground that it was unduly prejudicial because the events to which Stopher proposed to testify were too far removed in time from the actions for which he was charged—the possession of weapons in 2001. The court overruled Mr. Whitlow's objection and allowed the testimony; the court stated:

> Well, first of all, certainly the fact that this defendant has at some point in time acquired the knowledge of how to convert a semi-automatic weapon to an automatic weapon is relevant. It doesn't matter when he acquired the knowledge, once he acquired the knowledge he possesses the knowledge, and that is certainly relevant and

---

[11] Prior to trial, the Government had given notice of its intention to introduce Stopher's testimony as required by Federal Rule of Evidence 404(b). *See* R.11.

> pertinent to the Government's case in chief, and something they are obligated to prove in this kind of case.

Trial Tr. III at 18. Despite the relevancy of the testimony, the court acknowledged that Stopher's testimony included evidence of other wrongful acts that were not charged and that therefore the court was required to weigh the relevancy of the testimony against the possibility of unfair prejudice to Mr. Whitlow. The court determined that the evidence was probative of Mr. Whitlow's knowledge of how to convert semiautomatic weapons to automatic weapons; the evidence also was relevant to show an absence of mistake. The court concluded that, with a limiting instruction, the threat of undue prejudice would be minimized. It therefore allowed Stopher to testify to the events set forth above. At the time of Stopher's testimony, the court gave the following instruction:

> Ladies and gentlemen, during the course of Mr. Stopher's testimony, you will likely hear about certain acts of Mr. Whitlow other than those acts charged in the Superseding Indictment. Now, this evidence may be considered by you only on the question of Mr. Whitlow's knowledge and absence of mistake or accident, and it's to be considered by you only for this limited purpose.

Trial Tr. III at 132.[12]

At the close of the Government's case, Mr. Whitlow moved for a directed verdict. This motion was denied by the district court. A renewed motion for a directed verdict was not

---

[12] In its final instructions to the jury, the court similarly stated: "You have heard testimony from David Stopher regarding acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of knowledge and absence of mistake or accident. You should consider this evidence only for this limited purpose." Trial Tr. IV at 9.

made after the close of all evidence.

The jury returned a verdict of guilty on counts one through ten of the indictment. The jury found Mr. Whitlow not guilty on count eleven of the indictment.

Mr. Whitlow timely appealed.

## II

## ANALYSIS

### A. Sufficiency of the Evidence

Under usual circumstances, when a defendant challenges his conviction based on the sufficiency of the evidence, we ask only whether, when viewed in the light most favorable to the Government, the evidence was sufficient "to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt." *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002). Mr. Whitlow, however, failed to preserve this issue for review because he did not renew his motion for acquittal at the close of all of the evidence. *See id.* at 527-28. Consequently, we shall reverse Mr. Whitlow's conviction "only if his conviction[ ] amount[s] to a manifest miscarriage of justice," that is, " 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.' " *Id.* at 528 (quoting *United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000)).

Mr. Whitlow's argument with respect to the sufficiency of the evidence is a narrow one. He does not argue that the weapons that form the bases for counts seven through ten were never in his possession in some form. He also acknowledges that, when located by the Government, the weapons had been modified to operate as machineguns. Mr. Whitlow's argument is, essentially, that the Government failed

to prove that, at the time he possessed the weapons on or about May 17, 2001, they already had been modified to operate in fully automatic mode.

The evidence is more than sufficient to support a jury's conclusion that Mr. Whitlow possessed the guns in modified form. There was testimony that Mr. Whitlow had the knowledge and skill to modify a semi-automatic weapon into an automatic weapon. Furthermore, among the items taken from Mr. Whitlow's storage unit and found in the U-Haul were parts used to make automatic weapons as well as tripods on which to mount such weapons. Finally, the individuals who possessed the guns after May 17, 2001, testified that they had not altered the weapons to operate in automatic mode.

At bottom, Mr. Whitlow's argument is that it was possible that another individual modified the weapons between the time that they were removed from the J-11 unit on May 17, 2001, and the time that they were recovered by the Government. However, "[i]f the government proves its case by circumstantial evidence, it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Rose*, 12 F.3d 1414, 1420 (7th Cir. 1994) (internal quotation marks and citations omitted). Here, there was evidence that Mr. Whitlow originally possessed the weapons, that he knew how to modify the weapons, that he had the materials to modify the weapons, that he had the necessary equipment (tripods) to operate the weapons in automatic mode and that the other individuals in contact with the weapons did not alter the weapons. This evidence, even if it leaves open other possibilities, permits a conclusion beyond a reasonable doubt that, on or about May 17, 2001, Mr. Whitlow possessed the machineguns on which counts seven through ten are based.

**B. Rule 404(b) Evidence**

Mr. Whitlow maintains that portions of Stopher's testimony should have been excluded under Federal Rules of Evidence 403 and 404. Specifically, Mr. Whitlow argues that Stopher should not have been allowed to testify that he and Mr. Whitlow manufactured machineguns together in 1996 and 1997. This evidence, he contends, "was merely cumulative in light of the remainder of Stopher's testimony and was unfairly prejudicial." Appellant's Br. at 24.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake . . . ." Fed. R. Evid. 404(b). Furthermore, even if evidence is admissible pursuant to Rule 404(b), courts still are constrained by Rule 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. This circuit employs a four-pronged test to determine whether evidence of other crimes should be admitted:

> The evidence of the other act must 1) be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; 2) show that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) be sufficient to support a jury finding that the defendant committed the similar act; and 4) have probative value that is not substantially outweighed by the danger of unfair prejudice.

*United States v. Moore*, 115 F.3d 1348, 1354 (7th Cir. 1997) (citations omitted). As noted above, Mr. Whitlow's argu-

ment focuses on the fourth prong of the above test—that the resulting unfair prejudice outweighed the probative value of Stopher's testimony. We review the district court's decision to admit evidence under Rules 403 and 404(b) only for an abuse of discretion. *See United States v. Williams*, 238 F.3d 871, 874 (7th Cir. 2001).

We do not believe that the district court abused its discretion in admitting Stopher's testimony that he and Mr. Whitlow manufactured machineguns together in 1996 and 1997. The Government had the burden to prove beyond a reasonable doubt that Mr. Whitlow knew that the guns he possessed were machineguns. In addition, because the weapons had been modified to operate as machineguns, the Government, as a practical matter, also had to show that Mr. Whitlow knew how to convert semiautomatic weapons to automatic weapons. The evidence, therefore, was highly probative of one of the elements of the offense.

The district court also took precautions to ensure that the jury used the evidence only for a legitimate purpose—to establish Mr. Whitlow's knowledge of the relevant weaponry and to establish lack of mistake. The court gave the jury a limiting instruction both at the time of Stopher's testimony and in the final jury instructions. We previously have recognized that such instructions help "minimize the prejudicial effect of such evidence." *Williams*, 238 F.3d at 876. Given the fact that the court gave these instructions, and that Stopher's testimony regarding the manufacture of machineguns was relevant and succinct (consisting of only a few sentences, *see* Trial Tr. III at 142), we must conclude that the district court did not abuse its discretion in holding that any prejudicial impact was outweighed by the probative value of the evidence and, therefore, that Mr. Whitlow was not unfairly prejudiced by Stopher's testimony.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—8-25-04